Willis E. WILSON, Rep., Estate of
Tomikia Wilson, et al., Appellants

v.

GOOD HUMOR CORPORATION and
David A. Williams.

No. 83–2333.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 20, 1984.

Decided March 26, 1985.

William N. Rogers, Shaffer & Rogers, Rockville, Md., for appellants.

Thomas M. Wochok, Washington, D.C., for appellee, Good Humor Corp.

Broughton M. Earnest, Easton, Md., for appellee, David Williams.

Before WALD, HARRY T. EDWARDS and BORK, Circuit Judges.

Concurring Opinion filed by Circuit Judge BORK.

WALD, Circuit Judge:

This appeal involves a wrongful death action brought by Willis and Rosita Wilson against the Good Humor Corporation ("Good Humor") and David A. Williams for the death of their three-year old daughter Tomikia. Tomikia died from injuries sustained when she was struck by an automobile while attempting to cross the street in order to purchase ice cream from a Good Humor truck allegedly operated by Williams. At the close of the plaintiffs' case, the district court directed verdicts in favor of both Williams and Good Humor. The court ruled that the plaintiffs had not adequately identified Williams as the vendor involved in the accident and that they had failed to submit evidence upon which Good Humor could be held vicariously or directly liable for the acts or omissions of its vendor. We now affirm the directed verdict in favor of Williams. We conclude, however, that the plaintiffs presented sufficient evidence to permit a jury finding of liability on the part of Good Humor. We therefore reverse the district court's directed verdict in favor of Good Humor and remand for further proceedings consistent with this opinion.

## I. THE BACKGROUND

Good Humor has been engaged in the street sale of ice cream products in the Washington metropolitan area for well over 35 years. Until 1980, Good Humor maintained a traditional employer-employee relationship with its salespeople: it owned and maintained its ice cream trucks and it employed drivers to vend its products. *See* Gammon Testimony, Transcript ("Tr."), Record ("R.") 101 at 4–8. During this period, Good Humor recognized that curbside sales of ice cream created special hazards for its customers, especially children. *See id.* at 24–25. Accordingly, the company conducted an extensive safety program

that included on-site safety training, weekly safety bulletins, periodic slide shows, and the circulation of a general safety manual. *See id.* at 22A. Good Humor employees were admonished, among other things, to refrain from selling in locations which would require customers to cross busy roadways and, in any event, to assist children in crossing the street. *See id.*

Prior to the 1980 season, however, Good Humor substantially altered its business format and purported to establish its vendors as "independent contractors." Under this new *modus operandi*, vendors "purchased" their trucks from Good Humor, with the aid of Good Humor financing, and entered into a "vendor's agreement" authorizing them to sell Good Humor products which they bought wholesale from Good Humor. The vendors could sell ice cream at any price and at any location, they were not on the company payroll, and Good Humor did not supervise their day-to-day activities. *See id.* at 3–4, 9–10.[1] Good Humor scuttled its entire safety program when it adopted this independent contractor format. *See id.* at 22A.

On June 9, 1981, Williams purchased a Good Humor truck and entered into a vendor's agreement. *See id.* at 5. On June 29, 1981, a Good Humor vendor alleged to be the individual named in this lawsuit parked his Good Humor truck on the 4500 block of Benning Road in the northeast section of Washington—after dark at approximately 9:00 p.m.—and began to solicit customers by ringing the distinctive Good Humor jingle bells. *See* Thelma Hicks Testimony, Tr., R. 93 at 64. Benning Road is a heavily-trafficked thoroughfare, probably servicing more vehicles than any street in the neighborhood. *See* Patricia Hicks Testimony, *id.* at 91.

That evening, plaintiff Rosita Wilson and her daughter Tomikia were visiting Rosita's aunt, who lived across the street from the parked Good Humor truck. While Rosita Williams telephoned her husband, she left Tomikia in the care of two nieces. When the Good Humor vendor announced his arrival by ringing his distinctive bells, the nieces obtained ice cream money and proceeded across Benning Road. Unbeknownst to them, Tomikia followed, and, as she attempted to cross the street, several children apparently began shouting at her to return to the curb. When she tried to do so, she was struck by a car driven by Dominic Aluisi. *See* Thelma Hicks Testimony, Tr., R. 93 at 67–68. Shortly after a rescue squad took Tomikia to the hospital, Tomikia's grandfather, Samuel Barnhardt, arrived at the scene of the accident and questioned the driver of the Good Humor truck. At that time, the driver allegedly wrote his name, address and a Good Humor telephone number on a piece of paper and gave it to Barnhardt. *See* Barnhardt Testimony, *id.* at 119.

Tomikia died 11 days later.

On February 17, 1982, the plaintiffs brought a wrongful death action, *see* D.C. Code § 16–2701, against Aluisi. After initial discovery, however, the plaintiffs amended their complaint to add counts against Williams and Good Humor.[2] Good Humor thereupon cross-claimed against Aluisi and Williams; Williams likewise cross-claimed against Aluisi. The plaintiffs eventually dismissed their claims against Aluisi, apparently because they believed that he could not be found negligent under the circumstances of the accident. *See* Tr.,

---

1. The agreement also provides that the vendor shall devote his best efforts to "maximize sales of products purchased from Good Humor," that the vendor shall maintain certain personal hygiene standards, and that the vendor cannot sell non-Good Humor ice cream products without prior written permission from Good Humor. *See* Gammon Testimony, Tr., R. 101 at 9–12. Although the agreement itself was never placed into evidence before the jury, a Good Humor area sales manager testified at length concerning these provisions and the effect of the agreement on the independent contractor status of Good Humor vendors. *See id.*

2. The plaintiffs are citizens of the District of Columbia; Aluisi and Williams are Maryland citizens. Good Humor is a Delaware corporation with its principal place of business in Dover, Delaware. Jurisdiction was thus proper under 28 U.S.C. § 1332.

R. 103 at 3–4 (plaintiffs' opening statement to the jury). Defendant Williams could not be located by any party prior to trial. He answered the complaint through counsel who stated that Williams was "without sufficient information to either admit or deny" the plaintiffs' allegation that he was the Good Humor vendor involved in the accident. *See* R. Item 87 at 2–3. Although there was a significant pretrial controversy over whether Williams was properly served, the district court ultimately ruled that service was proper. *See Wilson v. Good Humor Corp.*, Civ. No. 82–0440, mem. op. at 2–4 (D.D.C. Sept. 3, 1983).

On November 22, 1983, the case against Williams and Good Humor went to trial. The plaintiffs sought to prove that Williams was liable for Tomikia's death under ordinary negligence principles. They sought recovery from Good Humor under theories of direct negligence and under several exceptions to the general rule that employers are not vicariously liable for the torts of their independent contractors. *See* Tr., R. 103 at 6–8, 10–11. At the close of the plaintiffs' case, both Williams and Good Humor moved for directed verdicts. The district court granted the motions from the bench, concluding that the plaintiffs had not presented sufficient evidence identifying the named defendant Williams as the ice cream vendor involved in Tomikia's death. *See* Tr., R. 100 at 2. The court dismissed the claim against Good Humor without prejudice, however, and granted the plaintiffs' motion to reopen with respect to Good Humor for the limited purpose "of proving that the David A. Williams who is a party to the vendor's agreement, who has any relationship whatsoever with Good Humor, is, in fact, . . . the driver of the vehicle" involved in the accident. *See id.* at 4. After the plaintiffs rested their reopened case, the district court again directed a verdict in Good Humor's favor. The court concluded that Good Humor was insulated from all liability by the independent contractor rule, that the plaintiffs could not succeed under any exception to that rule, and that the plaintiffs had not offered sufficient evidence to establish liability under a theory that Good Humor negligently selects its vendors. *See id.* at 4–5. This appeal followed.

## II. THE CLAIM AGAINST WILLIAMS

The district court concluded that the plaintiffs had not provided sufficient evidence to demonstrate that the David Williams named as a defendant was, in fact, the individual who parked a Good Humor truck on Benning Road the night of Tomikia's death.[3] On appeal, the plaintiffs assert that the directed verdict on the identification issue was improper and that the trial judge also abused his discretion by granting the plaintiffs' motion to reopen as to Good Humor, but denying the same motion as to Williams.

In order to survive a directed verdict motion on the identification issue under Rule 50 of the Federal Rules of Civil Proce-

---

**3.** Because the district court directed a verdict in Williams' favor on the identification issue, it did not rule on whether the plaintiffs offered sufficient evidence to permit a jury finding that the vendor involved in Tomikia's death was indeed negligent. The vendor's underlying negligence is therefore not at issue in this appeal. While we express no view on the proper resolution of this question, we do note that District of Columbia law generally requires three elements to sustain a negligence claim: (1) a duty, owed by the defendant to the plaintiff, to exercise reasonable care, (2) a breach of this duty, and (3) an injury to the plaintiff proximately caused by the defendant's breach. *See O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C.1982); *cf. Romero v. National Rifle Ass'n, Inc.*, 749 F.2d 77, 80 (D.C.Cir.1984). An individual can also be held liable for damages resulting from the intervening acts of third parties "[i]f the danger of an intervening negligent . . . act should have reasonably been anticipated and protected against." *St. Paul Fire & Marine Ins. Co. v. Davis Constr. Corp.*, 350 A.2d 751, 752 (D.C.1976); *see Romero*, 749 F.2d at 80. It appears that a majority of jurisdictions would allow the underlying proximate cause or breach of duty question concerning the vendor's conduct to go to the jury under circumstances similar to those involved in this case. *See, e.g., Neal v. Shiels*, 166 Conn. 3, 347 A.2d 102 (1974); *Mackey v. Spradlin*, 397 S.W.2d 33 (Ky.1965); *Annotation*, 84 ALR3d 826, 839–53 (1979 & Supp.1984) (collecting cases). *But cf. Bloom v. Good Humor Ice Cream Co.*, 179 Md. 384, 18 A.2d 592 (1941).

dure, the plaintiffs must offer sufficient evidence to enable a reasonable juror to conclude that Williams was the Good Humor vendor involved in the accident. *See, e.g., Klein v. District of Columbia,* 409 F.2d 164, 167 (D.C.Cir.1969). As the Supreme Court has explained:

When the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict, the Court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict. By such direction of the trial, the result is saved from the mischance of speculation over legally unfounded claims.

*Brady v. Southern R.R. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943). The plaintiffs contend that the identification issue should have gone to the jury if there was *any* evidence from which a jury could find that the named defendant was the vendor involved in the accident. Federal courts, however, have decisively rejected this so-called scintilla rule in favor of the *Brady* standard. *See* 5A Moore's Federal Practice § 50.02[1] at 24–32 (2d ed. 1948 & Supp.1984) (collecting cases).

■ In the somewhat peculiar context of this case, we conclude that the directed verdict on the identification issue was proper under the *Brady* standard. As we noted above, Williams could not be located by any party at any time prior to trial and he was not available for deposition or testimony at trial. *See supra* p. 1297. Moreover, Williams' counsel put all parties on notice that he intended to place the identification of his client at issue. *See* R. Item 86 (Williams' pretrial submission). Despite such notice, however, the only witness who testified concerning the identity of the vendor was Samuel Barnhardt. Barnhardt testified that he arrived at the scene of the accident after Tomikia had been taken to the hospital, that he spoke with the Good Humor vendor for approximately four minutes, and that the vendor volunteered his name, address and telephone number. *See* Barn-

hardt Testimony, Tr., R. 93 at 119–23. The plaintiffs did not, however, produce the piece of paper containing this information before they initially rested their case. Barnhardt also testified that the name of the involved Good Humor driver was "Davis" Williams, not "David" Williams. *See id.* at 121.

On cross-examination, Barnhardt indicated that he was unsure even of the driver's last name and suggested that his identification testimony was based on his reading of the suit papers rather than his recollection of the conversation two years earlier.

I wouldn't sit here and swear that his name was Williams. Okay? But I'm going to say that from what I recall, I believe, vaguely, that it was Williams, due to the fact that I haven't had the paper with his name on it to look at or to read it to remember, but I do believe that I recall his last name being Williams and confirmed it with the paper my son-in-law has—my daughter and son-in-law has with the name on it. And I took for granted as an assumption that this is his name.

*Id.* at 136–37. Neither Barnhardt nor any other witness offered a physical description of the Good Humor vendor involved in the accident; similarly, neither testimonial nor documentary evidence indicated that the Good Humor truck involved in the accident was the truck owned by Williams.

At issue in the directed verdict motion, then, was whether Barnhardt's bare and uncertain identification of the driver's name—in the absence of in-court identification, physical description or any other identification evidence—could permit a reasonable juror to conclude that the vendor at issue was in fact the defendant Williams. Although there are very few decisions on point, the case law supports a directed verdict in this context. *See Carle v. Rainey,* 83 F.2d 600, 601 (D.C.Cir.1936); *Turner v. Roberts,* 513 S.W.2d 957, 958–59 (Tex.Civ. App.1974); *Deutsch v. Ormsby,* 354 Mass. 485, 488, 238 N.E.2d 339, 341 (1968); *cf.*

*United States v. Fenster,* 449 F.Supp. 435 (E.D.Mich.1978) (criminal case). In *Carle,* for example, this court held that the trial court had erred in denying the defendant's motion for a directed verdict when the plaintiff's only identification evidence consisted of testimony by her husband that he had spoken with the defendant and that she had identified herself as a "Mrs. Carle." *Carle,* 83 F.2d at 601; *see also Deutsch,* 354 Mass. at 488, 238 N.E.2d at 341 (concluding that "[t]he bald identity of name ... was not enough" to go to the jury when the plaintiff could only testify that the defendant in an automobile accident had the same last name as the individual he spoke with after the accident).

We realize that the plaintiffs were substantially handicapped in their attempt to identify Williams by the defendant's absence throughout pretrial proceedings and the trial itself. The plaintiffs have not argued, however, that Williams purposely concealed himself in order to avoid service or to cast into doubt the identity of the Good Humor vendor involved in Tomikia's death. From the record before us, it appears that both Williams' counsel and Good Humor made good faith efforts to locate the defendant. Had the plaintiffs produced evidence of willful concealment, the district court could have deemed Williams' conduct an admission that he was the individual involved in the accident. *See, e.g., Carle,* 83 F.2d at 602; Fed.R.Civ.P. 37(d).[4] In the

absence of such evidence, however, we conclude that the plaintiffs did not offer sufficient evidence to permit a jury finding that Williams was the individual involved in the accident. Accordingly, we affirm the district court's directed verdict in favor of Williams.

After granting Williams' motion for a directed verdict, the district court dismissed without prejudice the claim against Good Humor. At that point, the plaintiffs moved to reopen their case against *Good Humor* in order to link the ice cream vendor involved in the accident to the Good Humor corporation, and the district court granted the motion.

I will hold my ruling on the motion for a directed verdict, or, for that matter, dismissing the complaint, in abeyance until Monday morning.

But you will have to be prepared to go forward. I will let you reopen solely for the purpose, as of 10 o'clock on Monday morning, of proving that the David A. Williams, who is a party of the vendor agreement, who has any relationship whatsoever with Good Humor, is, in fact, the David A. Williams, or, is, in fact, the driver of the vehicle that was on Benning Road on June 29th, 1981.

That is the sole purpose.

And I will dismiss the complaint without prejudice as of 10 o'clock on Monday morning if you are unable to make that probative link, which I think is an abso-

---

4. Similarly, the plaintiffs did not seek any of the discovery sanctions designed to protect parties unreasonably deprived of crucial information before trial. As we noted above, Williams' attorney filed a responsive pleading in this case averring that Williams was "without sufficient information to either admit or deny" each of the plaintiffs' allegations—including the allegation that Williams was the Good Humor vendor involved in the accident. *See* R. Item 87; *supra* p. 1297. This equivocal response was sufficient to shield Williams from default at that stage in the litigation. *See* C. Wright, A. Miller & M. Kane, 10 Federal Practice and Procedure § 2686 (2d ed. 1983). Had Williams given a similar response to virtually any discovery request concerning his involvement in the accident, however, the plaintiffs could have sought a variety of sanctions under Rule 37 of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 37(a)(3)

("an evasive or incomplete answer is to be treated as a failure to answer" for the purposes of discovery sanctions); *see also id.* 36(a) (allowing the court to deem facts admitted if a party tenders insufficient answers to requests for admissions). Upon an appropriate motion, for example, the district court had the authority to establish certain facts (*e.g.,* that Williams was the involved vendor) for the purposes of trial, to strike the defendant's pleading or parts thereof, or to enter a default judgment against Williams. *See id.* 37(b)(2). These sanctions would apply with equal force had Williams failed to attend a properly noticed deposition. *See id.* 37(d). The plaintiffs apparently chose to go forward without the aid of these sanctions; in doing so, they took the chance that Williams would not be adequately identified as the Good Humor vendor involved in Tomikia's death.

lutely critical link to allow you to go to the jury on the issue of apparent authority.

Tr., R. 100 at 4. In the reopened case, the plaintiffs recalled Barnhardt, and he testified that he remembered the vendor's last name independently of the suit papers. The plaintiffs also placed into evidence the piece of paper upon which Williams had allegedly written his name and address, and a private investigator retained by the plaintiffs testified that he had attempted to track down Williams at that address. *See* Tr., R. 93 at 44–49. The investigator also testified that a Good Humor truck labelled "Number 124" was parked in front of the residence. *See* Tr., R. 93 at 213. The Good Humor truck purchased by defendant Williams was also identified as truck number 124. *See* Gammon Testimony, Tr., R. 101 at 9.

 On appeal, the plaintiffs argue that it was an abuse of discretion to allow the plaintiffs to reopen only their claim against Good Humor when the trial judge apparently believed that the plaintiffs would have to identify the named defendant as the David Williams involved in the accident and a party to a vendor's agreement with Good Humor in order to state a *prima facie* case against Good Humor. The record, however, does not indicate that the plaintiffs specifically moved to reopen the case against Williams after the district court granted the directed verdict. Even had they done so, we would not be inclined to reverse the district court. Appellate courts are generally loath to overturn a trial judge's decision declining to reopen trial proceedings in the absence of a rare abuse of discretion. *See, e.g., Contempo Metal Furniture Co. v. East Texas Motor Freight Lines, Inc.*, 661 F.2d 761, 766–67 (9th Cir.1981); *cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 332, 91 S.Ct. 795, 803, 28 L.Ed.2d 77 (1971). Moreover, a plaintiff's failure to call available witnesses or produce existing evidence

does not ordinarily constitute grounds to reopen a case. *See, e.g., Bell Laboratories Inc. v. Hughes Aircraft Co.*, 73 F.R.D. 16, 20 (D.Del.1976); *Rue v. Feuz Constr. Co.*, 103 F.Supp. 499, 502 (D.D.C.1952). Here, the plaintiffs had ample notice that Williams' identification would be placed at issue and simply failed to come forward with evidence within their possession and an available witness.

 We also believe that the trial judge's instructions concerning the reopened case against Good Humor need not be read as inconsistent with any refusal to reopen as to Williams. The plaintiffs could provide a sufficient link to Good Humor by demonstrating that any Good Humor vendor was the individual involved in Tomikia's death or that *a* David Williams was present at the scene of the accident and was a party to a Good Humor vendor's agreement. Neither of these findings would compel a conclusion that the individual (or even the "David Williams") so identified was *the* David Williams named as the defendant in this case. The trial judge clearly indicated that the directed verdict was based on the plaintiffs' inability to identify the Good Humor vendor involved in the accident as the David Williams named in the lawsuit. *See* Tr., R. 93 at 37 ("I don't think that you have sufficiently identified the occupant of that truck, with whom [Barnhardt] spoke on the evening of the accident, as being the David Williams who is the named defendant in this suit."); *see also id.* at 36. We therefore do not believe that it was arbitrary or inconsistent for the district court to permit the plaintiffs to reopen only their claim against Good Humor.[5]

In sum, we conclude that the directed verdict in favor of Williams was proper and that the trial judge did not abuse his discretion by declining to allow the plaintiffs to reopen their case against Williams.

---

5. The plaintiffs apparently did not move to reopen their case against Williams after the paper containing the vendor's name and address was located and after the investigator testified in the reopened case against Good Humor.

### III. The Claim Against Good Humor

The general rule in the District of Columbia[6] is that an employer of an independent contractor is not liable for physical harm caused by the acts or omissions of the contractor. *See, e.g., WMATA v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 888 (D.C.1982); *Lindler v. District of Columbia,* 502 F.2d 495, 498 (D.C.Cir.1974), *see also* Restatement (Second) of Torts § 409 (1965) [hereinafter cited as *Restatement 2d* ]. This independent contractor rule, however, bristles with a series of long-standing exceptions specifying certain conditions under which employers can be held vicariously or directly liable for the torts of their contractors. *See, e.g., Restatement 2d* §§ 410–429. *See generally id.* § 409 comment b; Prosser and Keeton on the Law of Torts § 71 at 510 (W. Keeton 5th ed. 1984) [hereinafter cited as *Prosser and Keeton* ]. Both the rule and its exceptions are derived from the same underlying policies. The general rule encompasses the notion that employers should not be held responsible for activities they do not control and, in many instances, lack the knowledge and resources to direct. *See, e.g., Restatement 2d* § 409 comment b. The exceptions, in the main, reflect special situations where the employer is in the best position to identify, minimize and administer the risks involved in the contractor's activities. *See, e.g., Prosser and Keeton* § 409 at 509–10 (collecting cases); Harper, *The Basis of the Immunity of an Employer of an Independent Contractor,* 10 Ind. L.J. 494, 498–500 (1935).

In this case, the plaintiffs attempt to circumvent the general rule of non-liability in a number of ways. First, they argue that Good Humor vendors should be deemed "employees" rather than independent contractors either because Good Humor retains the right to exercise control over crucial aspects of their work or under a theory of "apparent agency." They also contend that Good Humor could be found liable under an exception to the general rule because its vendors engaged in "inherently dangerous" activity or activity likely to create "peculiar risks" under specific circumstances. *See Restatement 2d* §§ 413, 427. The plaintiffs finally assert that Good Humor could be found liable for failing to exercise reasonable care in the selection of its vendors.

The district court rejected each of these arguments. We agree that the plaintiffs did not present enough evidence to go to the jury on the actual agency, apparent agency or negligent selection theories.[7] We also agree with the district court that selling ice cream, as such, is not an inherently dangerous activity. We conclude, however, that the plaintiffs submitted sufficient evidence to permit a jury finding that Good Humor knew or had special reason to know of the peculiar risks to children inherent in the street sales of ice cream and took absolutely no precautions to warn its vendors or to otherwise minimize those risks—a finding sufficient to impose liability on Good Humor despite the general independent contractor rule.

#### A. The Employee/Independent Contractor Distinction

Because employers are normally liable for the torts of employees committed within the scope of their employment, *see, e.g., District of Columbia v. Davis,* 386 A.2d

---

6. All three parties have assumed throughout this case that the common law of the District of Columbia provides the choice of law rules and the substantive rules of decision for the plaintiffs' underlying claims. We agree. *See Stancill v. Potomac Electric Power Co.,* 744 F.2d 861, 864 n. 16 (D.C.Cir.1984); *Myers v. Gaither,* 232 A.2d 577, 583 (D.C.1967); Restatement (Second) of Conflict of Laws § 145 (1971).

7. The concurrence surprisingly states that "it is not necessary to resolve" the apparent agency issue. Conc.Op. at p. 1315 n. 16. In fact, how-

ever, the district court directed a verdict in Good Humor's favor on the apparent agency doctrine, *see supra* p. 1297, and the plaintiffs have appealed that ruling, *see* Notice of Appeal, R. Item 92. On appeal, of course, the plaintiffs seek a ruling directing the district court to submit their case to the jury under this doctrine. We therefore do not understand how we could decide this appeal *without* considering whether the district court correctly determined that the plaintiffs could not go to the jury under an apparent agency theory.

1195, 1203 (D.C.1978), vicarious liability often turns in the first instance on the distinction between an "employee" and an "independent contractor." Although this distinction is usually a matter of degree, courts generally find an employer-employee relationship only if the employer retains the right to control and direct the day-to-day activities of the putative employee. *See, e.g., Prosser and Keeton* § 70 at 500–02 (collecting cases). "The decisive test ... is whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." *Dovell v. Arundel Supply Corp.*, 361 F.2d 543, 544 (D.C.Cir.), *cert. denied*, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966); *see Ludolph v. Bechtel Assocs. Professional Corp.*, 542 F.Supp. 630, 633 (D.D.C.1982); *LeGrand v. Insurance Co. of North Am.*, 241 A.2d 734, 735 (D.C.1968).

■ In this case, the plaintiffs did not offer any evidence that Good Humor retained or exercised the right to control any substantial portion of its vendors' day-to-day work. The testimony of Wilbur Gammon, an area sales manager for Good Humor, constituted virtually the only evidence on this issue. Gammon testified that Good Humor vendors could sell ice cream products at any location and at any price they chose. *See* Gammon Testimony, Tr. 101 at 9–10. He testified that Good Humor could not require vendors to employ the distinctive Good Humor jingle bells and that the company could not even ask a vendor to park his truck in a safer location in response to persistent customer complaints.[8] Accordingly, we agree with the district

court that the plaintiffs failed to present sufficient evidence to go to the jury on the theory that Good Humor vendors should be considered employees. *See* Tr., R. 100 at 4–5.[9]

**B. *Apparent Agency***

The plaintiffs also contend that Good Humor could be found vicariously liable for the torts of its vendors under a theory of "apparent agency" or "agency by estoppel" because the company holds its vendors out to be agents of Good Humor. *See, e.g.,* Restatement (Second) of Agency § 267 (1958). In effect, this doctrine would prevent Good Humor from denying any liability for the torts of its independent contractors while it profits from the image and good will created by the company's general business reputation and its former training and supervision of its vendors. Although there is apparently no local law on this theory, many jurisdictions have permitted a finding of vicarious liability under an apparent agency doctrine—typically in a franchisor/franchisee context. *See, e.g., Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790–95 (3d Cir.1978) (Pennsylvania law); *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 176–77 (5th Cir.1975) (Alabama law); *Gizzi v. Texaco, Inc.*, 437 F.2d 308, 309–11 (3d Cir.) (New Jersey law), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 57 (1971); *Singleton v. International Dairy Queen, Inc.*, 332 A.2d 160, 163–64 (Del.1975); *Buchanan v. Canada Dry Corp.*, 138 Ga.App. 588, 592, 226 S.E.2d 613, 616 (1976).

■ Each of these jurisdictions, however, has required plaintiffs to demonstrate

---

**8.** Gammon went to some length to demonstrate Good Humor's inability to control the activities of its vendors.

> Q. If you were called by a parent and they said one of the drivers consistently parked on the other side of a railroad track at the time the train came, would you do something about that because children had almost been killed? Would you take no action?
>
> . . . .
>
> A. I would tell that caller that the man owned his own vehicle, "I have no control over him, and why don't you talk to him?"

Tr., R. 101 at 23.

**9.** On appeal, the plaintiffs point to provisions in the vendor's agreement allowing Good Humor some say over the "personal hygiene" of its vendors and providing that a vendor must devote his best efforts to "maximize the products sold by Good Humor." *See* Gammon Testimony, Tr., R. 101 at 9–11; *supra* note 1. We do not believe that these provisions could create any substantial right to control the day-to-day *manner* in which vendors sold ice cream products.

that they reasonably relied on the business reputation or good name of the employer in doing business with the independent contractor. *See, e.g., Singleton,* 332 A.2d at 163. In this case, the plaintiffs did not present evidence that anyone involved in the accident relied on Good Humor's general business reputation. None of the adults responsible for Tomikia, for example, testified that they knew that a Good Humor vendor periodically sold ice cream in the neighborhood, that they heard the distinctive Good Humor jingle bells, and that they permitted the children to buy ice cream in general reliance on the safety reputation of Good Humor vendors. Had they done so, this might well have been a different case. *See, e.g., Wood,* 508 F.2d at 176 (reversing a judgment notwithstanding the verdict); *Gizzi,* 437 F.2d at 310 (reversing a directed verdict). On the record before us, however, we must agree with the district court that there is no "evidence from which this jury would be able to conclude that there had been a reasonable reliance upon the appearance of a master-servant relationship between the driver of the truck and the Good Humor corporation." *See* Tr., R. 100 at 3.

## C. *Inherent Danger or Peculiar Risk*

■ The plaintiffs also argue that Good Humor's street vending operation falls within one of the most important exceptions to the general rule of non-liability because it involves a "peculiar risk" or an "inherent danger" to Good Humor customers, especially children. *See, e.g., Restatement 2d* §§ 413, 427; 41 Am.Jur.2d *Independent Contractors* § 40 (1968). The district court ruled that Good Humor could not be found liable under the "inherent danger" exception because the selling of ice cream, as such, is not a generically dangerous activity that creates risks to others notwithstanding reasonable precautions.

> I do not find selling ice cream to be an inherently dangerous occupation. I just don't think it can be treated in the same terms as the use of blow torch on pipes, or conducting controlled explosions, or

things of that nature, which is the sort of conduct the cases speak of in terms of inherently dangerous activities.

Tr., R. 100 at 4. We believe that the district court based its rejection of the inherent danger doctrine on too narrow a view of both the doctrine and its rationale as articulated in local law and elsewhere. In particular, we conclude that the plaintiffs should be able to go to the jury on the theory that Good Humor knew or had special reasons to know that its street vending operation was likely to create, under particular circumstances, a peculiar risk to children absent special precautions, and did absolutely nothing to minimize or even warn its vendors of that risk.

■ The District of Columbia unmistakably recognizes an exception to the general rule of non-liability when an employer engages an independent contractor to perform "inherently dangerous" work. *See Lindler v. District of Columbia,* 502 F.2d 495, 498 (D.C.Cir.1974); *Vale v. Bonnett,* 191 F.2d 334, 335 (D.C.Cir.1951); *WMATA v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 868 (D.C.1982). In our view, these cases can reasonably be read to suggest that two distinct types of independent contractor activity can bring an employer within this exception. As the district court recognized, the doctrine quite clearly applies to *generically* hazardous activities— work that, regardless of the skill with which it is undertaken, poses a danger to others. *See, e.g., Vale,* 191 F.2d at 339. Yet local law also suggests that this exception applies when an employer has reason to know that his independent contractor is likely, *under particular circumstances,* to endanger others absent reasonable precautions. As this court has noted, "[d]anger is a relative term. Inherently dangerous may be defined as 'unusually hazardous.' However, it is also a relative term *depending on the entire situation under examination.*" *Vale,* 191 F.2d at 338 (emphasis added); *see also L'Enfant Plaza,* 448 A.2d at 868 ("Whether a particular kind of work is inherently dangerous is essentially a relative determination based on the facts of

the particular case."). The applicability of the "inherent danger" exception, then, depends not only on the generic nature of an independent contractor's work but also on the fact-specific, particular circumstances under which any task is to be performed. *See Prosser and Keeton* § 71 at 513–15; 41 Am.Jur.2d, *Independent Contractors* § 40 at 802–05 (1968 & Supp.1984); 57 C.J.S. *Master and Servant* § 590 at 362 (1948 & Supp.1984).

The Restatement of Torts, in turn, explicitly indicates that an employer can be found liable under either this circumstance-specific application of the inherent danger exception or under a distinct, but intimately related, "peculiar risk" exception to the general rule of nonliability. Under the Restatement's inherent danger doctrine, for example,

> [o]ne who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, *or which he contemplates or has reason to contemplate when making the contract,* is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

*Restatement 2d* § 427 (emphasis added). The comments to this section, moreover, makes clear that the inherent danger exception is *not* limited to generically hazardous work.

> The rule stated in this Section is commonly expressed by the courts in terms of liability of the employer for negligence of the contractor in doing work which is "inherently" or "intrinsically" dangerous. It is not, however, necessary to the employer's liability that the work be of a kind which cannot be done without a risk of harm to others, or that it be of a kind which involves a high degree of risk of such harm, or that the risk be one of very serious harm, such as death or serious bodily injury.... It is sufficient that *work of any kind* involves a risk, *recognizable in advance,* of physical harm to others which is inherent in the work itself, *or normally to be expected in the ordinary course of the usual or prescribed way of doing it, or that the employer has special reason to contemplate such a risk under the particular circumstances under which the work is to be done.*

*Id.* comment b (emphasis added); *see also* S. Speiser, L. Krause & A. Gross, The American Law of Torts § 4:33 at 708–12 (1983) (collecting cases) [hereinafter cited as *American Torts* ].

Section 413 of the Restatement supports direct liability if the employer has reason to know that the independent contractor's work is likely to create a peculiar risk to others absent special precautions and if the employer takes no steps to minimize that risk by contract or otherwise.

> One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
>
> (a) fails to provide in the contract that the contractor shall take such precautions, or
>
> (b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.

*Restatement 2d* § 413.[10] The Restatement defines a "peculiar risk" as a risk "peculiar

10. The Restatement also suggests that an employer may sometimes be liable under the peculiar risk doctrine "even though the employer has provided for the taking of special precautions in the contract or otherwise." *Restatement 2d* § 416. The Restatement clearly indicates, however, that section 413 governs the liability of employers such as Good Humor who fail to provide in the contract or in some other manner for the taking of precautions to guard against a peculiar risk. *See id.* comment c; id. § 413 comment a. Indeed, the plaintiffs based their peculiar risk argument on section 413 both in the district court, *see infra* note 11, and on appeal, *see* Brief for Appellants at 22–26. Because Good Humor did not provide for the

to the work to be done, and arising out of its character, or *out of the place where it is to be done*, against which a reasonable [person] would recognize the necessity of taking special precautions." *Id.* § 413, comment b (emphasis added); *see also, e.g., Griesel v. Dart Industries, Inc.,* 23 Cal.3d 578, 586, 591 P.2d 503, 507, 153 Cal.Rptr. 213, 717 (1979).[11]

■ The peculiar risk doctrine, then, also depends on the fact that the employer knew or had special reason to know that, absent special precautions, an independent contractor's activities were likely to create a particular risk to others in the specific circumstances under which the work is normally done. Many jurisdictions, in turn, have applied section 413 of the Restatement where, as here, the employer failed in any way to guard against known peculiar risks. *See Restatement 2d* § 413 (App. 1984) (collecting cases); *American Torts* § 4:33 at 708–09 (same). While the District of Columbia courts have not faced the question of whether to adopt or reject section 413, we believe that there are sufficient indications in local law to suggest that they would apply some version of the peculiar risk doctrine to the circumstances

of this case. In particular, we predict that local courts would permit a jury to find Good Humor liable in this case ·under the circumstance-specific exception to the general rule of non-liability codified in the peculiar risk doctrine of section 413.[12]

In this case, Gammon's testimony concerning Good Humor's pre-1980 safety practices was sufficient to permit a jury finding that Good Humor knew or had special reason to know of the risks to children likely to arise from the street vending of ice cream. Gammon testified that, until 1981, Good Humor was particularly concerned with the safety of children who approached its curbside vendors. *See* Tr., R. 101 at 24–25. He stated that Good Humor previously circulated a general safety manual and weekly safety bulletins, conducted frequent and extensive safety training, and explicitly instructed its drivers concerning procedures for minimizing the risks to children. *See id.* at 22A. Gammon also repeatedly testified that, after 1981, Good Humor neither warned its vendors of the known peculiar risks nor took *any* safety precautions whatsoever; indeed, Gammon went so far as to assert that Good Humor would not (or could not)

---

taking of any special precautions in this case, we need not determine what liability it might have incurred under the version of the peculiar risk doctrine embodied in section 416. We intimate no view as to the proper resolution of that question.

11. The peculiar risk theory of Restatement § 413, was raised in substance throughout the pretrial legal proceedings, *see, e.g.,* Motion to Amend Complaint, R. Item 29 ¶¶ 2–4, 8–9; Second Amended Complaint, R. Item 35 ¶¶ 10, 17, 18, and in the plaintiffs' trial memorandum, *see* Plaintiffs' Trial Memorandum, R. Item 102 at 1–3 (citing, among other things, *Restatement 2d* § 413). The plaintiffs also relied on the inherent danger exception to the general rule of non-liability before the district court. *See* Plaintiffs' Trial Memorandum, R. Item 102 at 1–3. As we explained above, however, that doctrine entails an inquiry into the particular circumstances surrounding the independent contractor relationship and the task to be performed. *See supra* p. 1304.

12. Both Good Humor and Williams suggest that the relevant issue here is whether District of Columbia courts would "accept" or "reject" the "expanded exception" to the general rule of non-

liability embodied in sections 427 and 413 of the Restatement. *See* Brief for David Williams at 23–25; Brief for Good Humor at 31–34. While we agree that no local court has explicitly adopted the Restatement sections, we think it reasonable to read the District of Columbia cases as recognizing that the availability of the inherent danger exception depends on the particular circumstances surrounding the independent contractor relationship and the task to be performed, *not* on the generic quality of the work as the district court supposed. *See L'Enfant Plaza,* 448 A.2d at 868; *supra* pp. 1303–1304.

We also note that many "traditional" articulations of the inherent danger exception routinely recite the circumstance-specific, peculiar risk principles codified in the Restatement. *See, e.g., Weilbacher v. J.W. Putts Co.,* 123 Md. 249, 255, 91 A. 343, 345–46 (1914); *Wright v. Tudor City Twelfth Unit, Inc.,* 276 N.Y. 303, 305–08, 12 N.E.2d 307, 308–09 (1938); 41 Am.Jur.2d *Independent Contractors* § 40 (1968 & Supp.1984) (collecting cases); *American Torts* § 4:33 at 708–12 (same); *Prosser and Keeton* § 71 at 513–15 (same).

take any action even if it were informed that a particular vendor sold Good Humor products in a manner creating a patently reckless risk to children. *See id.* at 23; *supra* note 7. In our view, Gammon's testimony constituted sufficient evidence to support a jury finding of liability under the inherent danger or peculiar risk doctrines. We must therefore reverse the district court's directed verdict in favor of Good Humor.

In doing so, we note that Good Humor's relationship with its vendors presents a rather unusual factual situation. In the typical independent contractor scenario, an individual or a business hires a contractor to carry out a relatively discrete, one-shot activity outside the general scope of the employer's enterprise. In that context, insulating the employer from tort liability continues to have some appeal: the contractor, *not* the employer, is rightly held responsible for recognizing when her activities are likely to create risks to others and for exercising reasonable care to avoid those risks. The employer normally does not control the manner in which the task is performed, is not in the best position to take safety precautions, and ordinarily lacks the special knowledge necessary to recognize that the contractor's work will likely create peculiar risks to others absent special precautions.

None of these factors characterizes Good Humor's relationship with its "independent contractor" vendors. Good Humor vendors are engaged to perform the bulk of Good Humor's business, and Good Humor undoubtedly contemplates that they will do so through the curbside sale of Good Humor products from "Good Humor" trucks. The vendors do not possess any special experience or knowledge concerning the risks

peculiar to their task. Good Humor, by contrast, has special and detailed knowledge of the peculiar risks to children involved in its operation and is in the best position to ensure reasonable safety awareness. Despite its concededly extensive knowledge of those risks, moreover, Good Humor has apparently *chosen* to disclaim responsibility for warning its vendors or for taking any precautions whatsoever against the known and specific dangers to children who purchase ice cream from their vendors.

The Restatement indicates that employer liability is especially reasonable in this context where an independent contractor is engaged to perform an integral aspect of the employer's business and the employer has special knowledge and experience concerning the work to be performed.

[In applying the peculiar risk exception to the general rule of non-liability,] the extent of the employer's knowledge and experience in the field of work to be done is to be taken into account; and an inexperienced widow[er] employing a contractor to build a house is not expected to have the same information, or to make the same inquiries, as to whether the work to be done is likely to create a peculiar risk of physical harm to others, or to require special precautions, as is a real estate development company employing a contractor to build the same house.

*Restatement 2d* § 413 comment f; *see also Mackey v. Campbell Constr. Co.*, 101 Cal. App.3d 774, 779, 162 Cal.Rptr. 64, 68 (1980) ("[In applying section 413], the *extent* of the knowledge of the employer in the field of work is to be taken into account, *i.e.*, the more extensive his knowledge and experience, the more applicable the rule.").[13] The

**13.** The concurrence professes pleasure that our "economic analysis is confined to the facts of this case" and rejects "the notion that courts can freely redesign liability rules to penalize an innocent party who also happens to be the cheapest cost avoider." Conc.Op. at p. 1314 n. 13. Of course, there could hardly be any dispute over this proposition. We do, however, think it reasonable to point out that the Restatement and

several state courts have found the peculiar risk doctrine particularly appropriate in circumstances such as those in this case, and of course we limit our holding to those circumstances. In particular, nothing in this opinion depends on Good Humor's general business expertise or whether Good Humor is the cheapest cost avoider. *See id.* at 1314. Instead, it is the simple fact that Good Humor admittedly has

Restatement likewise suggests that the peculiar risk exception is especially relevant where, as here, the risk is one which the employer should recognize as likely to arise in the course of the particular method which the employer knows the contractor will adopt. *See Restatement 2d* § 413 comments b, f.

We emphasize that our limited holding here is predicated on the somewhat unusual circumstances surrounding Good Humor's recent conversion to an independent contractor operation, its detailed knowledge of the special risks to children involved in curbside ice cream vending, and its refusal to take any steps aimed at ensuring that special precautions were taken to guard against those risks. In particular, our holding does not mean that an employer such as Good Humor is forever "locked" into liability for the negligence of its contractors as a result of its previous experience in a field of business. A finding of liability under the peculiar risk doctrine or the circumstance-specific component of the inherent danger doctrine must be supported by evidence that, at the time the contractor was hired, the employer knew or had special reason to know of the specific risks likely to arise from the manner in which the contractor performed his assigned risk. Because the plaintiffs provided ample evidence that Good Humor possessed comprehensive knowledge of the special risks to children involved in the street vending of ice cream products when it hired its independent contractor vendors, we need not determine when an employer's prior experience in a field of business alone constitutes sufficient knowledge of the peculiar risks involved.[14] Accordingly, we hold *only* that, under the circumstances of this case, Good Humor cannot insulate itself from liability in its own field of business when it engaged vendors to sell Good Humor products from the curbside, knew or had special reason to know of the risks to children inherent in its operation, and flatly refused to take *any* steps designed to minimize those risks, including warning its vendors. Under these circumstances,

*specific, special knowledge* of the *actual* peculiar risk involved in this lawsuit that, in part, creates liability. Moreover, our holding does *not* mean that Good Humor must "devis[e] and supervis[e] a system of contracts that would control the safety-related conflict of the independent contractors." *Id.* On the record before us, it appears that Good Humor took absolutely no steps aimed at guarding against the peculiar risks involved in its street vending operation, including alerting the vendors to those risks. *See supra* pp. 1305–1306. We conclude only that the plaintiffs adduced sufficient evidence at trial in order to seek a jury determination under the peculiar risk doctrine. We are not, however, presented with the issue that the concurrence is so anxious to resolve, namely the precise nature of employer conduct that will satisfy an employer's duties under section 413 or any other version of the peculiar risk doctrine. The resolution of that issue, we believe, should be left for another day.

**14.** At oral argument, counsel for Good Humor compared Good Humor's situation in this case to that of a multi-faceted business concern that decides, for bona fide economic reasons, to close down the retail end of its operation and continue only as a manufacturer/wholesaler. We agree that an erstwhile manufacturer/retailer normally would not be responsible for the sort of accident involved in this case if it had completely withdrawn from retailing and maintained no say over the manner in which its products are eventually sold to the public. *Cf. Prosser and Keeton* § 69 at 499–500 (noting that employer liability always depends on a special relationship between principal and agent). In that situation, however, the relationship between the manufacturer/distributor and the eventual seller of the product would not even rise to the level of an independent contractor relationship. *Cf.* 41 Am.Jur.2d, *Independent Contractors* § 1 at 730–39 (defining an independent contractor as one who is engaged to perform a specific task for another). This is most assuredly not the case here. Good Humor has not relinquished all direction over the general manner in which its products are to be retailed. Instead, it engages "independent contractors" for the exclusive purpose of selling its products and *specifically provides* that its products are to be sold on the curbside from vehicles bearing the Good Humor corporate name and trademark. *See* Gammon Testimony, Tr., R. 101 at 9–11. We have concluded that Good Humor does not exercise *day-to-day* control over its vendors' activities. *See supra* pp. 1301–1302. But Good Humor cannot hire vendors to sell its products in a given manner—namely, through street vending—and then disclaim any responsibility for the special risks involved in that specified task given its extensive knowledge of those risks.

we conclude that the plaintiffs are entitled to a jury determination on Good Humor's liability under the peculiar risk doctrine.

We are thus at a loss to understand the concurrence's concern that we have written too broadly in predicting the principles under which local courts would decide this case. Although Judge Bork agrees that some version of the peculiar risk doctrine should be applied to this case, *see* Conc.Op. at p. 1310, he apparently disagrees with the precise scope of that doctrine as codified and discussed in the Restatement. Instead, he prefers to enunciate and to project onto local courts his own peculiar risk principles, analogizing from other local doctrines which, incidentally, do not establish that a tortfeasor's obligations are *limited* to a duty to warn. *See* Conc.Op. at pp. 1313–1314.[15] While we agree that Good Humor's failure even to warn its vendors

of the danger is enough to go to the jury here, we find it reasonable and appropriate to look for general guidance on the peculiar risk doctrine to an established authority, and the Restatement has traditionally served that purpose.[16]

We do not seek to impose the whole of sections 413 or 427 onto the law of the District of Columbia—even for the purpose of deciding this case. That is not necessary given Good Humor's failure to take *any* action, including its vendors, aimed at minimizing known peculiar risks. At the same time, however, we can confidently say that if local courts behave in the future as they have in the past, they too will look to the Restatement for guidance in determining difficult and novel issues of tort law. *See, e.g., Cottom v. McGuire Funeral Servs., Inc.,* 262 A.2d 807, 808–09 (D.C. 1970) (discussing the strict products liabili-

---

**15.** Two of those cases involve the manufacturer's duty to warn the ultimate *users* or *consumers* of a potentially dangerous product. *See Burch v. Amsterdam Corp.,* 366 A.2d 1079 (D.C. 1976); *Edwards v. Mazor Masterpieces, Inc.,* 295 F.2d 547 (D.C.Cir.1961). Even in the products liability context, however, the local courts have stated that simple warnings such as those mandated by federal labelling laws, do not preclude common law liability if a reasonable person would recognize the necessity of taking "additional precautions," including particular "instructions for its safe use" to guard against special known risks. *See Burch,* 366 A.2d at 1084–86 & n. 16 (discussing *Restatement 2d* §§ 288C, 388); *id.* at 1084 ("Under common law, a seller has a duty to give adequate warnings of the hazards involved in the use of a product *and instructions for its safe use* if he knows or has reason to know that the product is likely to be dangerous.").

The remaining cases cited by the concurrence stand only for the proposition that individuals have a duty to warn others of specific forseeable or known risks under some circumstances, not that there is no duty to do anything other than warn under those circumstances. *See Ellis v. Safeway Stores, Inc.,* 410 A.2d 1381, 1382–83 (D.C.1979) (shopkeeper not liable for criminal assault on customer because the risk was *not* forseeable, *no* steps could have been taken to avoid the assault, and there was *no* opportunity to warn); *Viands v. Safeway Stores, Inc.,* 107 A.2d 118, 119–20 (D.C.Mun.App.1954) (plaintiff entitled to a jury determination of whether the *overall conduct* of a shopkeeper in the face of a known danger, including the failure to warn *or*

*the failure to take reasonable safety measures* on his own, amounted to a breach of the shopkeeper's duty of care). In *Ramsay v. Morrissette,* 252 A.2d 509 (D.C.1969), moreover, the court *expressly held* that a landlord could be found liable for a third person's assault on a tenant, notwithstanding the fact the tenant had been warned of the danger, if the landlord's failure to take other, direct precautions was not reasonable in light of the circumstances. *See id.* at 512–13 (noting the landlord's alleged failure to replace the resident manager, to inform the police, to install a lock on the front door and to prevent intruders from frequenting the entrance to the building). The *Ramsay* court thus explicitly *declined* to limit a landlord's obligation to a duty to warn as the concurrence would have us do today.

**16.** Accordingly, we do not, as the concurrence states, "endors[e] the Restatement even though [we] disapprove of what the Restatement says." Conc.Op. at p. 1315 n. 17. We conclude that the plaintiffs offered sufficient evidence to go to the jury under a circumstance-specific peculiar risk theory based on the evidence that the defendant took *no* action, including its vendors, designed to minimize a specific known risk. That theory of liability, firmly rooted in the Restatement, is enough to defeat a directed verdict, and we need not and do not determine the precise level of employer care that will insulate it from peculiar risk liability in the next case or even in any further proceedings in this case. Thus our holding does not necessarily *limit* an employee's liability under the peculiar risk doctrine to a general duty to warn as the concurrence suggests. *See* Conc.Op. at p. 1310.

ty doctrine of *Restatement 2d* § 402A); *Berman v. Watergate West, Inc.*, 391 A.2d 1351, 1357 (D.C.1978) (same); *Russell v. G.A.F. Corp.*, 422 A.2d 989, 991–94 (D.C. 1980) (looking to several Restatement sections for determining a manufacturer's liability for failure to warn of product defects); *Lacy v. District of Columbia*, 424 A.2d 317 (D.C.1980) (looking to the Restatement's proximate cause standards to determine an employer's liability for harm caused by a third party's sexual assault of an employee). Indeed, this court has recently so assumed. *See Halberstam v. Welch*, 705 F.2d 472, 476–86 (D.C.Cir.1983) (Wald, J., joined by Bork and Scalia, JJ.) (looking to the Restatement's standards for liability under an "aiding or abetting" theory where local law was sparse but suggested that District of Columbia courts would accept the Restatement's rationale).

Similarly, we do not conclude or even intimate that local law concerning the peculiar risk doctrine is settled. Instead, we candidly engage in the predictive exercise that post-*Erie* federal courts have always undertaken in diversity cases, however uncomfortably. *See, e.g., Halberstam,* 705 F.2d at 479. We are also aware that *L'Enfant Plaza*, an "inherent danger" case, is only a compass and not a road map as to how local courts would handle a "peculiar risk" case. *See supra* pp. 1303–1304. On the other hand, we would not be so bold as to confine the boundaries of the peculiar risk doctrine, about which the local courts have never spoken, to a duty to warn as Judge Bork does. *See* Conc.Op. at pp. 1313–1314. The District may indeed choose to go further and adopt, as many states have, a broader view. This court might also be confronted in the future with a claim for liability notwithstanding meager employer warnings. We do not wish to speculate now on either eventuality. In sum, we perceive no real difference between ourselves and the concurrence concerning the holding or the rationale in this case other than our reluctance to project onto local courts or this court a peculiar risk standard far narrower than the Restatement's and grounded in no clear local authority.

### D. *Negligent Selection*

Under the doctrine of negligent selection, employers can be found directly liable under ordinary negligence principles for hiring an independent contractor if the employer knew or reasonably should have known that the contractor was not competent *and* if the contractor's incompetence proximately caused injury to others. *See, e.g., Restatement 2d* § 411; *American Torts* § 4:25 at 690–95 (collecting cases); *Annotation* 78 ALR 3d 910 (1977 and Supp.1984) (same). Under this doctrine, however, a plaintiff must establish a causal link between the employer's negligent selection and the resulting injury; the harm must "result from some quality in the contractor which made it negligent for the employer to entrust the work to him." *Restatement 2d* § 411 comment b; *see Western Stock Center, Inc. v. Sevit, Inc.*, 195 Colo. 372, 376, 578 P.2d 1045, 1048 (1978) (en banc); *cf. American Torts* § 4:8 at 570–75; *id.* § 4:26 at 693. In this case, for example, the plaintiffs would have to demonstrate that Good Humor failed to exercise reasonable care in determining whether the vendor involved in the accident was competent to perform his assigned task *and* that the accident proximately resulted from the vendor's incompetence.

At trial, the plaintiffs offered substantial evidence that Good Humor does not exercise reasonable care in selecting its independent contractors. Gammon testified that Good Humor does not conduct any background inquiry before it hires its vendors and Good Humor would have "no reason" to turn down *any* applicant. *See* Gammon Testimony, Tr. R. 101 at 18. Under some circumstances, this aggressive indifference to the fitness of its vendors might well subject Good Humor to liability under a negligent selection theory. *See Annotation,* 78 ALR 3d 910, 931–35 (1977 & Supp.1984) (collecting cases). Yet the plaintiffs did not offer any evidence that the vendor involved in Tomikia's death was in fact incompetent or reckless; neither did they provide evidence that his alleged incompetence—as opposed to simple negli-

gence on his part—proximately caused the accident. We must therefore agree with the district court that the plaintiffs did not come forward with sufficient evidence to go to the jury on a negligent selection theory. *See* Tr., R. 100 at 4.

## IV. CONCLUSION

For the foregoing reasons, we affirm the directed verdict in favor of David Williams and we affirm the directed verdict in favor of Good Humor on the actual control, apparent agency and negligent selection theories. We conclude, however, that the plaintiffs are entitled to a jury determination of Good Humor's liability under the inherent danger or peculiar risk exceptions to the general rule that employers are not liable for the torts of independent contractors. We therefore reverse the directed verdict in favor of Good Humor on that issue and remand this case for a new trial limited to the question of whether Good Humor should be found liable under the peculiar risk or inherent danger doctrines.

*So ordered.*

BORK, Circuit Judge, concurring:

While I concur in the judgment of the court and in Part II of Judge Wald's thorough opinion, I write separately because I would limit Good Humor's obligations un-der the peculiar risk doctrine to a general duty to warn.[1] The majority decides that there is a duty to warn but declines to decide whether Good Humor is under any additional duty. This seems to me unsatisfactory. The case is being remanded and yet the trial judge is given no guidance on how to charge the jury about the extent of Good Humor's obligations.[2] To remedy that deficiency, I propose a clear rule derived from the District of Columbia case law on duties to warn. This rule imposes less sweeping obligations on Good Humor than the expansive Restatement rule, *Restatement (Second) of Torts* § 413 (1965), and is more clearly in accord with local law. Since, it is plain under this formulation that Good Humor is not entitled to a directed verdict at the present time, I concur in the majority's decision to reverse the judgment of the district court.

In this case, defendant Good Humor demonstrated over a period of 35 years that it knew of, and was very concerned about, peculiar risks to children coincident with the business of curbside ice cream sales.[3] Notwithstanding that knowledge, when the defendant reorganized its business and established its vendors as independent contractors, the evidence currently suggests that it failed in any way to warn those contractors of the dangers involved.[4]

1. The peculiar risk doctrine is one of several recognized exceptions to the general rule that employers cannot be held vicariously liable for the torts of their independent contractors. That general rule is important because it embodies the fundamental notion that individuals are responsible for their own actions and should generally not be made liable for torts committed by other people. The rule is integrally related to the concepts of fault and of individual responsibility that are also fundamental to the law of torts.

2. This lack of specificity presents the substantial risk that we may find the trial judge's charge inadequate even after this case has been tried, which would lead to a second reversal and yet another trial.

3. Good Humor's awareness of this particular risk is established by its longstanding maintenance of the following safety precautions: on-site safety training, weekly safety bulletins, periodic slide shows, the circulation of a general safety manual, and its prior practice of warning vendors not to sell ice cream in locations where children would have to cross busy streets. I do not mean to suggest that all of the information imparted by this program had to be given the independent contractors. They surely would be aware of some risks such as those attendant upon driving with defective brakes. But the risks of attracting children to a truck are less immediately obvious and not part of every driver's understanding. It is thus appropriate that Good Humor warn of that particular risk.

4. It is conceivable that Good Humor will be able to prove on remand that Williams, its independent contractor, was adequately warned of the peculiar risk at issue in this case. For example, record evidence suggests that Good Humor informed Williams that he had to obtain a special vending license from the District of Columbia government in order to conduct his curbside ice cream sales. *See* Deposition of Wilbur L. Gammon at 51–52. *See also id.* at 10, 27, 34. The

It is certainly arguable that, as a direct consequence of this failure to warn, David Williams parked his ice cream truck on a busy thoroughfare,[5] and an accident ensued.

Unlike the majority, I do not think it clear that the District of Columbia Court of Appeals will look to the *Restatement (Second) of Torts* (1965) [hereinafter cited as *Restatement 2*] to decide cases like this, much less that the Court of Appeals will adopt the Restatement's expansive version of the peculiar risk doctrine. That Court has never endorsed or rejected *any* version of the peculiar risk doctrine, and the majority's reliance on *WMATA v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 868 (D.C. 1982), is therefore misplaced since that case concerned an activity that was "inherently dangerous and unusually hazardous." *Id.* The Court of Appeals made no mention of the peculiar risk doctrine in *L'Enfant Plaza* and was concerned only with the different problem of vicarious liability for ultra-hazardous activities. The majority misapprehends the significance of that case in suggesting that it endorses the Restatement's teachings on peculiar risk.[6]

The majority suggests that courts that have accepted vicarious liability for inherently dangerous activities must necessarily accept it for failure to take precautions against peculiar risks. Maj.Op. at 1303–1304. Yet the Restatement itself recognizes that the inherent danger and peculiar risk doctrines are analytically distinct.[7] Acceptance of the former demonstrates little, if anything, about probable acceptance of the latter. It would be wrong for us to assume that the District of Columbia endorses the Restatement's expansive version of the peculiar risk doctrine merely because it subscribes to traditional notions of vicarious liability in ultra-hazardous lines of work.

Since the District of Columbia courts have neither adopted nor rejected any version of the peculiar risk doctrine, I am compelled to consider what those courts would do if they had to decide this case. Many state courts have cited approvingly even the expansive version of the peculiar risk doctrine set forth in sections 413, 416, and 427 of the *Restatement 2d of Torts.*[8]

process of obtaining that license may well have put Williams on notice of the need to take special care with children. It appears that the District imposes local time, place, and manner restrictions on curbside ice cream sales, quite possibly for safety reasons. *Id.*

I will not speculate here as to what level of governmental warning would suffice to put Williams on notice and would relieve Good Humor of its obligations to warn. That question will have to be answered as new evidence is produced either on remand or in the trial of some future case. The possibility that Williams was adequately warned, by Good Humor or others, makes it all the more important that we now establish whether Good Humor had a duty to do more than warn. Otherwise, it becomes significantly more likely that the scenario described in footnote 2 will actually come to pass.

5. Had Williams been warned, as Good Humor's pre-1980 employee-drivers were warned, he would have known not to park in such a heavily travelled location. The responsibility for having done so would then be entirely his.

6. The majority also relies incorrectly on two previous decisions of this court which recognize an inherent danger exception under District of Columbia law to the general rule of non-liabili-

ty. *See, e.g., Lindler v. District of Columbia,* 502 F.2d 495, 498 (D.C.Cir.1974); *Vale v. Bonnett,* 191 F.2d 334, 335 (D.C.Cir.1951). Neither case mentions the peculiar risk doctrine or the Restatement formulation of this particular theory of vicarious liability.

7. The majority argues that the inherent danger and peculiar risk exceptions are closely related because both emphasize the particular circumstances surrounding a specific job and independent contractor relationship. However, many legal doctrines emphasize the importance of specific circumstances, and it does not follow from this that they all embrace the same fundamental principles. The inherent danger exception as discussed in *L'Enfant Plaza* clearly applies in cases where the nature of the work is dangerous no matter how performed. The peculiar risk doctrine, on the other hand, applies to work that is safe if a risk peculiar to that work is known and avoided. While the two doctrines may be related, they are not identical and ought not be confused.

8. The relevant sections of the *Restatement 2d* provide as follows:
 § 413. *Duty to Provide for Taking of Precautions Against Dangers Involved in Work Entrusted to Contractor*

*See Restatement 2d* (Appendix. §§ 413, 416 and 427 (collecting cases). But there is no need for us to endorse those sections of the Restatement here. Section 413 goes far beyond the mere creation of a duty to warn and obligates employers to enter into contracts with their franchisees in order to regulate their conduct with respect to safety. Employers are thus required to devise safety programs for their independent contractors and may well be liable if those programs fail to protect or if the employers do not supervise the contractors' compliance with the programs in a manner that courts or juries later consider adequate. Section 413 thus expands vicarious liability far beyond the bounds traditionally recognized in the District of Columbia. In practice, the Restatement formulation may severely undermine the advantages of doing business through independent contractors, advantages which accrue to the public as well as the employer and which the basic rule against vicarious liability is intended to preserve. Imposition of a duty to warn has no such untoward effects.

Nonetheless, the majority apparently believes that we should adopt the Restatement rule in this case because in the past the District of Columbia courts have sometimes looked to the Restatement for guidance in resolving difficult issues of law. Maj. op. at 1308. But there is no presumption that if a local court sometimes relies on the Restatement, that court will rely on it for all future propositions as well. It will often be tempting for federal courts in diversity cases simply to follow the Restatement rules where local law is silent. The Restatement, after all, seems authoritative and claims the support of numerous cases.[9] This is a temptation which we must resist, however, since a practice of always following the Restatement would be very much like adopting the American Law Institute's conclusions as federal common law. Under *Erie* we must not assist in the creation of a "federal general common law."[10] *Erie R.R. v. Tompkins*, 304

---

One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer
(a) fails to provide in the contract that the contractor shall take such precautions, or
(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions.
§ 416. *Work Dangerous in Absence of Special Precautions*
One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.
§ 427. *Negligence as to Danger Inherent in the Work*
One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to

such others by the contractor's failure to take reasonable precautions against such danger.

9. These cases, in fact, are not always as supportive as they are made to appear. For example most of the cases which are collected in the Appendix to Restatement § 413 do not endorse the view that employers should be obligated to enter into contracts with their franchisees concerning safety. A number of cases concern only inherently dangerous activities, *Sword v. Gulf Oil Corp.*, 251 F.2d 829 (5th Cir.1958), *cert. denied*, 358 U.S. 824, 79 S.Ct. 41, 3 L.Ed.2d 65 (1958); *Matanuska Electric Ass'n v. Johnson*, 386 P.2d 698, 700 (Alaska 1963); *Stubblefield v. Federal Reserve Bank of St. Louis*, 356 Mo. 1018, 204 S.W.2d 718 (1947); *Majestic Realty Associates, Inc. v. Toti Contracting Co.*, 54 N.J.Super. 419, 149 A.2d 288 (1959), *aff'd*, 30 N.J. 425, 153 A.2d 321 (1959); while other cases involve only negligent selection of an independent contractor, *Carr v. Merrimack Farmers Exchange, Inc.*, 101 N.H. 445, 146 A.2d 276 (1958), or liability because of a failure to warn. *Contino v. Baltimore & Annapolis R.R.*, 178 F.2d 521, 525 (4th Cir.1949).

10. It is well to remember Justice Field's classic comments on the federal common law which were quoted approvingly by Justice Brandeis in *Erie*:
I am aware that what has been termed the general law of the country—which is often little less than what the judge advancing the doctrine thinks at the time should be the

U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) (Brandeis, J.).

Instead, we should be guided where possible by analogous rules that have been adopted by the District of Columbia courts. Those courts have in the past imposed duties to warn in several cases where one individual has special knowledge of a peculiar danger to others. While these cases were not decided under the peculiar risk doctrine, they involved fact situations that are in many ways analogous to the fact situation before us. In one such case, for example, the Court of Appeals held that a seller or manufacturer of a dangerous product has a duty to warn users of foreseeable risks from misuse of the products and to provide specific directions for safe use. *Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1084–86 (D.C.1976); *Edwards v. Mazor Masterpieces, Inc.*, 295 F.2d 547 (D.C.Cir.1961). In another case, the Court of Appeals imposed a warning requirement where an unusual danger was peculiarly foreseeable to a store owner, while unknown to a patron. *Viands v. Safeway Stores, Inc.*, 107 A.2d 118 (D.C.1954); *Ellis v. Safeway Stores, Inc.*, 410 A.2d 1381,

1383 (D.C.1979). In yet a third case, it was said that under certain circumstances a landlord would be liable even for the criminal misconduct of third parties if he "was aware of a dangerous situation and took no action either to remedy the situation or to warn the tenants of the danger." *Ramsay v. Morrissette*, 252 A.2d 509, 512 (D.C. 1969).

In each of these cases, the District of Columbia courts imposed liability on a party who failed to warn notwithstanding his special knowledge of a peculiar risk. While none of the cases involved independent contractors, two of them did involve a more distant plaintiff-defendant relationship than exists in the present case. *Burch v. Amsterdam Corp.*, 366 A.2d 1079; *Viands v. Safeway Stores, Inc.*, 107 A.2d 118. Moreover, liability appears to have depended in these cases as much on the foreseeability of the harm as on the duty owed to the plaintiff or to a third party.[11] A jury could reasonably find that harm was foreseeable as a result of Good Humor's failure to warn. Accordingly, because of the local case law on duties to warn,[12] I think that the District of Colum-

---

general law on a particular subject—has been often advanced in judicial opinions of this court to control a conflicting law of a State. I admit that learned judges have fallen into the habit of repeating this doctrine as a convenient mode of brushing aside the law of a State in conflict with their views. And I confess that, moved and governed by the authority of the great names of those judges, I have, myself, in many instances, unhesitatingly and confidently, but I think now erroneously, repeated the same doctrine. But, notwithstanding the great names which may be cited in favor of the doctrine, and notwithstanding the frequency with which the doctrine has been reiterated, there stands, as a perpetual protest against its repetition, ... the autonomy and independence of the States.

*Erie R.R. v. Tompkins*, 304 U.S. at 78, 58 S.Ct. at 822 *quoting Baltimore & O.R.R. v. Baugh*, 149 U.S. 368, 401, 13 S.Ct. 914, 927, 37 L.Ed. 772 (1893) (Field, J., dissenting).

**11.** Thus, we recently noted that

it makes no difference whether we discuss ... liability in terms of duty of care or proximate causation, "since the fundamental analysis appears to remain constant ... whether we speak of an attenuated chain of cause and

effect ... or the actor's obligation toward the party he may injure." *Munson v. Otis*, 396 A.2d 994, 996 (D.C.1979) (per curiam). This is merely an acknowledgment that the division of tort analysis into the constituent elements of duty, breach, and causation—or into "negligence" and "causation"—is largely artificial. *See Graham v. M & J Corp.*, 424 A.2d [103] at 107 [ (D.C.1980) ] ("the issue of causation is subsumed in the issue of duty"); W. PROSSER, *supra*, § 42 at 245 (when dealing with questions of duty of care and proximate causation, "circumlocution is unavoidable, since all of these questions are, in reality, one and the same").

*Romero v. National Rifle Ass'n of America*, 749 F.2d 77, 80 n. 4 (D.C.Cir.1984).

**12.** The majority challenges my reliance on this case law by arguing that the cases I have cited "do not establish that a tortfeasor's obligations are *limited* to a duty to warn." Maj. op. at 1308 n. 15. Accordingly, the majority correctly notes that in at least one case the District of Columbia courts have held that the duty to warn requires the giving of instructions for safe use, *Burch*, 366 A.2d at 1084–86 & n. 16, while in another case the duty to warn may require the taking of additional precautions such as alerting the po-

bia courts would hold that Good Humor had a duty to warn Williams of the peculiar risks of curbside vending to children.

I reach this conclusion notwithstanding the various policy arguments advanced by the authors of the Restatement for their more expansive version of the peculiar risk doctrine. *See* Maj. op. at 1305–07. These arguments implicitly assume that courts should decide tort cases according to liability rules that will promote an economically efficient result.[13] I am sure that analysis justifies placing an obligation upon Good Humor to warn its independent contractors of dangers. The company has accumulated information over many years and can pass on that information at very little cost, certainly at a far lower cost than all of the vendors would incur if they had to reaccumulate the knowledge by themselves. But it is far from clear that accidents can be avoided most efficiently by placing upon Good Humor the additional obligation of devising and supervising a system of contracts that would control the safety-related conduct of the independent contractors. Such a system may be extremely expensive, both in administration and later litigation over the adequacy of that administration, and may result in a less effective method of avoiding accidents. We have not performed the investigation

and analysis that would justify a conclusion on that score. In the absence of knowledge, we ought not impose major reallocations of costs that businesses, and hence society, must bear but should respect the basic policy of the rule against vicarious liability, which is to let individuals and businesses arrange their affairs as they see fit.[14]

The task upon which the Restatement would have courts embark is essentially legislative in character, in the sense that major redistributions of costs involve the making of significant policy choices. The making of such choices contrasts with Justice Holmes' description of the proper role of common-law judges who "do and must legislate but ... can do so only interstitially; they are confined from molar to molecular motions." *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting). While common law creation of new tort rules may have been justified in past centuries when societies were less democratic, it is surely more problematical in an era when legislative assemblies have become the principal lawmakers.[15] It may be that cost-inefficient allocations of responsibilities would be "fairer" or that more accidents could and should be avoided than

---

lice to the existence of a dangerous situation. *Ramsay*, 252 A.2d at 512–13.

Contrary to the majority's allegations, I have not attempted here to spell out the precise contours of what would constitute an "adequate" warning of a peculiar risk under District of Columbia law. That would involve a highly fact-specific inquiry into foreseeability which could only be undertaken on a case-by-case basis as future disputes arose. I do note, however, that none of the local cases even remotely support the Restatement's position that a business should be obligated to devise and supervise a system of contracts that would control the safety-related conduct of the independent contractors. The District of Columbia law on analogous situations focuses instead on the provision of an adequate warning given the totality of the circumstances in each case.

13. I am pleased that the majority's economic analysis is confined to the facts of this case, and I join the majority in its explicit rejection of the notion that courts can freely redesign liability rules to penalize an innocent party who also

happens to be the cheapest cost avoider. Maj. op. at 1306 n. 13.

14. I therefore do not agree that vicarious liability would always be appropriate where efficiency concerns suggest that an employer should have warned an employee of a peculiar risk. Federal courts exercising diversity jurisdiction do not have the authority to rewrite the District's or a State's law of torts in order to achieve "efficient" or "fair" results. I have discussed the economic efficiency argument only because the District as yet has no law on this subject and because it is the implicit justification for the Restatement's expansive doctrine of peculiar risk.

15. For an interesting discussion of the recent judicial expansion of tort liability *see* Remarks of Michael J. Horowitz, Counsel to the Director of the Office of Management and Budget, Fourth International Conference on Product Liability and Consumer Protection and Management Forum, Munich, West Germany, November 19, 1984.

efficiency considerations alone suggest. If we had to grapple with such imponderables in order to rewrite existing tort law, we would have to decide whether these are considerations too legislative in nature for a court legitimately to admit into its calculus. The District has a legislature and can of course alter its tort rules any time it chooses. But, as I have said, this case can be decided on a far narrower ground: the simple recognition of a duty to warn held by a franchisor with extensive knowledge of a peculiar danger not so well understood by its franchisees.[16]

Subject to these clarifications and understandings, I concur in the majority opinion and in the judgment of the court.[17]

16. In so holding I wish to clarify two additional points. First, while Good Humor's failure to warn may render it liable to the Wilsons, it does not necessarily relieve Williams of any liability he may have to Good Humor on that company's cross-claim. The majority does not address the cross-claim, and I therefore assume that it remains alive. We simply have not addressed the issue and express no opinion on its proper resolution.

Second, I concur in the majority's opinion insofar as it discusses the Employee/Independent Contractor Distinction and the doctrine of Negligent Selection. I reserve judgment, however, on the question of whether the District of Columbia courts would adopt the doctrine of Apparent Agency. It is not necessary to resolve this question, since the plaintiffs could not go to the jury on this theory, see maj. op. at 1302–

1303, even if it applied under District of Columbia law.

17. The majority accuses me of seeking to bind local courts to a peculiar risk standard far narrower than the Restatement's. Maj. op. at 1309. Obviously, I make no such attempt because this court lacks authority to adopt binding constructions of local law in diversity cases. My criticism of the broader Restatement rule is made only because the majority insists on endorsing the Restatement even though it does not approve of what the Restatement says. Under these circumstances, clarity requires that I explain why I prefer the narrower rule and why I believe the local courts would adopt it. If those courts choose to disagree with me, they can of course adopt the broader Restatement rule or indeed any other rule.