Kirby v. Read 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-95-00544-CV







The Scott Fetzer Company d/b/a The Kirby Company, Appellant



v.



Dena Kristi Read, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT


NO. 93-05986, HONORABLE JOSEPH H. HART, JUDGE PRESIDING







 The Scott Fetzer Company, doing business as The Kirby Company ("Kirby"), appellant,
appeals from a judgment awarding actual and exemplary damages to appellee, Dena Kristi Read, after she
was sexually assaulted in her home by a Kirby dealer. In eight points of error, Kirby argues that the
evidence is legally and factually insufficient to support jury findings (1) that Kirby breached any duty to
Read; (2) that Kirby proximately caused Read's injuries; (3) that Kirby acted
with gross negligence; and (4) awarding Read exemplary damages.  We will affirm in part and reverse in
part.


FACTUAL AND PROCEDURAL BACKGROUND


 Kirby manufactures vacuum cleaners and sells them through a marketing system of in-home
demonstrations performed by door-to-door salespersons. Kirby vacuums are multi-task appliances that
retail for approximately $1,200-$1,300. Kirby has found that the most effective way to sell its products
is through in-home demonstrations. As a result, Kirby eschews direct sales to the public and sells its
products only to independent "distributors." The relationship between Kirby and each of its distributors
is governed by a uniform Distributor Agreement, which proclaims that the distributors act as independent
contractors in performing their duties under the contract. As part of their obligations to Kirby under the
Distributor Agreement, the distributors are required to sell Kirby products exclusively through in-home
demonstrations. Kirby would consider a violation of this provision a material breach of the Distributor
Agreement. To promote this facet of the agreement, each distributor is required to build an in-home sales
force by recruiting prospective door-to-door salespeople called "dealers." (1) Though it requires in-home
sales, Kirby does not require its distributors to conduct background checks on prospective dealers.

 In 1992, Leonard Sena, a long-time Kirby distributor, hired Mickey Carter to be a dealer. 
On his application, Carter listed three prior places of employment and three personal references. Sena did
not call Carter's references or prior employers. In fact, Sena did nothing to check Carter's background
or any of the information on his application. If Sena had contacted Carter's prior employers, he would
have discovered that women who had worked with Carter at those jobs had complained that he engaged
in inappropriate sexual conversations and made unwanted obscene telephone calls. In addition, at the time
he applied to sell Kirby vacuums door-to-door, Carter had been arrested and had received deferred
adjudication for an incident in which he exposed himself to two young girls. One of the previous employers
listed on Carter's application had fired him because of that indecent-exposure incident. Carter's
employment records with that company contained a copy of the confession Carter gave to the police when
he was arrested. The confession stated:

 

First I want you to know I have a problem. I need help. I was in [a] psychiatric ward
when I was in the Army. I have this thing in my mind that controls me at times. I can't
help what I do. Like I go outside naked. I expose myself. I do things that I do not have
control of. . . . I know I need help. I want someone to help me. I need the help before
the devil controls me. Please, have them get me help.


The employment records also contained witness statements, Carter's guilty plea, and the indictment
charging him with the offense. They also document another incident in which Carter was discovered
masturbating in front of a woman at his apartment complex.

 One of the personal references listed on Carter's application was David Bruchs, who
worked with Carter's wife at a Seguin bank. Bruchs knew that Carter had exposed himself to two young
girls at his apartment complex and was on probation. Bruchs also had information that Carter and his wife
had been evicted from various apartments because of Carter's sexually inappropriate conduct. He also
knew of a specific incident when Carter "flashed" another female bank employee. Sena never discovered
this information, however, because he did not call Bruchs. Thus, in spite of Carter's sordid history, he was
hired to sell Kirby vacuums to unsuspecting homemakers in the privacy of their homes.

 In March 1993, after having been allowed into Read's home to perform a Kirby
demonstration, Carter sexually assaulted Read while her children were taking an afternoon nap. Read and
her husband sued Kirby, Sena, and Carter. (2) The claims against Carter were non-suited prior to trial. The
Reads' case was submitted to the jury under a "broad form" negligence question asking the jury to
determine the comparative negligence of Kirby, Sena, and Kristi Read. Because the trial court had granted
Sena's motion for a bifurcated trial on exemplary damages, questions on exemplary damages were withheld
subject to a finding of gross negligence. See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 29-30
(Tex. 1994). The jury found Sena and Read each ten percent negligent and Kirby eighty percent negligent. 
The jury also found Kirby grossly negligent. With regard to damages, the jury found that Kristi Read had
suffered $1,500,000 in actual damages, but that her husband had no monetary damages.

 Due to the finding of gross negligence against Kirby, the trial court began the exemplary-damages phase of the trial. During their deliberations in this second phase, the jurors indicated that they
had reached an impasse. The jury sent out a note stating that some of the jurors felt exemplary damages
were included in the actual damages found in the trial's first phase. Outside the jurors' presence, counsel
for all parties expressed concern at the jury's deadlock. The trial court noted that the jury had not been
discharged, the verdict from the first phase had not been formally accepted, and no new evidence had been
presented in the second phase that could prejudice the jury. The court proposed to counsel a procedure
by which it would instruct the jury that, if they were not satisfied that they had followed the instructions in
the first-phase charge, they could deliberate further on both actual and exemplary damages simultaneously. 
Both the Reads' and Sena's counsel expressed their satisfaction with that instruction, and the trial court
subsequently gave it to the jury.

 After further deliberation, the jury returned a new damages verdict: $200,000 in actual
damages and $1,500,000 in exemplary damages. The Reads' counsel then objected for the first time to
the court's new instruction and requested an additional period of re-argument. The court denied this
request and accepted the jury's verdict. Pursuant to former section 41.007 of the Civil Practice and
Remedies Code, which limited exemplary damages to four times the amount of actual damages, the trial
court reduced the exemplary damages award to $800,000. (3) Judgment was ultimately rendered against
Kirby for $160,000 in actual damages and $800,000 in exemplary damages, plus prejudgment and
postjudgment interest and costs. On appeal, Kirby claims it owed
Read no duty and that the evidence is legally and factually insufficient to show that Kirby
proximately caused Read's damages and to support the award of exemplary damages. In a cross-point,
Read argues the trial court erred by failing to render judgment on the jury's first determination of actual
damages. We will affirm the award of actual damages and reverse the award of exemplary damages.

DISCUSSION

The Duty Owed to Kristi Read

 Read's cause of action rests on negligence and gross negligence on the part of Kirby. The
common-law doctrine of negligence consists of three elements: (1) a legal duty owed by one person to
another; (2) a breach of that duty; and (3) damages proximately resulting from that breach. El Chico
Corp. v. Poole, 732 S.W.2d 306, 311 (Tex. 1987); Rosas v. Buddies Food Store, 518 S.W.2d 534,
536 (Tex. 1975). The threshold inquiry in a negligence case is whether a duty exists. El Chico Corp., 732
S.W.2d at 311. In its first two points of error, Kirby asserts that, because Sena and Carter were
independent contractors, it owed no legal duty to Read. We disagree.


(i)  Duty Arising from Knowledge of a Peculiar Risk

 Whether the defendant owes a legal duty to the plaintiff is a question of law. Mitchell v.
Missouri-K.-T. R.R., 786 S.W.2d 659, 662 (Tex. 1990). The general rule is that an employer or owner
is not liable for the acts or omissions of its independent contractors. See Abalos v. Oil Dev. Co., 544
S.W.2d 627, 631 (Tex. 1967); American Nat'l Ins. Co. v. Denlee, 95 S.W.2d 370, 373 (Tex. 1936). 
Texas courts, however, have recognized many exceptions to this general rule of non-liability. (4) Both the rule
and its exceptions are derived from the same underlying policies. The general rule encompasses the notion
that employers should not be held responsible for activities they do not control and, in many instances, lack
the knowledge and resources to direct. See Restatement (Second) of Torts [hereinafter "Restatement"]
§ 409, cmt. b (1965). The exceptions largely reflect special situations where the employer is in the best
position to identify, minimize, and administer the risks involved in the contractor's activities. See W.
Prosser & W. P. Keeton, Prosser and Keeton on the Law of Torts § 71, at 509-10 (5th ed. 1984);
Fowler V. Harper, The Basis of the Immunity of an Employer of an Independent Contractor, 10 Ind.
L. J. 494, 498-500 (1935); see also Restatement §§ 410-429 (1965) (listing 24 exceptions to the general
rule of non-liability). One of these long-recognized exceptions is encompassed by the doctrine of "peculiar
risk."

 The peculiar-risk exception establishes liability for an employer who hires an independent
contractor to do work that the employer knows is likely to create "a peculiar risk of physical harm to
others" absent special precautions. The peculiar-risk exception is premised on the putative existence of
a duty to third parties that the employer, for policy reasons, may not delegate to an independent contractor. 
Its use is traced to the leading English case of Bower v. Peate, 1 Q.B.D. 321 (1876), in which an
independent contractor undermined the plaintiff's building by negligently failing to shore up an excavation
on his employer's adjacent land. The court held the independent contractor's employer liable, finding that:


[A] man who orders a work to be executed, from which, in the natural course of things,
injurious consequences to his neighbours must be expected to arise unless means are
adopted by which such consequences may be prevented, is bound to see to the doing of
that which is necessary to prevent the mischief, and cannot relieve himself of his
responsibility by employing some one else . . . .


Id. at 326. The peculiar-risk exception represents an allocation of risk and prevents unscrupulous
employers of independent contractors from hiding behind the drawbridge of immunity of the independent
contractor's general rule of non-liability. Cf. Byrd v. Skyline Equipment Co., 792 S.W.2d 195, 197
(Tex. App.--Austin 1990), writ denied per curiam, 808 S.W.2d 463 (Tex. 1991) (party cannot "shed"
a legal duty by engaging an independent contractor to do the actual work). 

 The peculiar-risk exception is exemplified by section 413 of the Restatement:


One who employs an independent contractor to do work which the employer should
recognize as likely to create a peculiar unreasonable risk of physical harm to others unless
special precautions are taken, is subject to liability for physical harm caused by the absence
of such precautions if the employer:


 (a) fails to provide in the contract that the contractor shall take such precautions,
or


 (b) fails to exercise reasonable care to provide in some other manner for the
taking of such precautions.



Restatement §413 (1965). Thus, under the peculiar-risk exception, liability may be imposed on the
employer of an independent contractor if the employer has reason to know that the independent
contractor's work is likely to create a peculiar risk of harm to others absent special precautions and if the
employer takes no steps to minimize that risk.

 A peculiar risk relates to special risks "peculiar to the work to be done, and arising out of
its character, or out of the place where it is to be done, against which a reasonable [person] would
recognize the necessity of taking special precautions." Wilson v. Good Humor Corp., 757 F.2d 1293,
1304-05 (D.C. Cir. 1985) (quoting Restatement § 413, cmt. b (1965)). "Peculiar," though, does not mean
that the risk must be one that is abnormal to the type of work done, or that it must be an abnormally great
risk. It has reference only to a special, recognizable danger arising out of the work itself, of which special
precautions can be taken to avert the risk. Good Humor, 757 F.2d at 1304-05.

 The peculiar-risk doctrine has been applied to many situations. For example, in Good
Humor, a child was fatally struck by a car as she responded to a Good Humor ice cream vendor who
parked his truck on the street and began "ringing the distinctive Good Humor jingle bells." 757 F.2d at
1296. In holding Good Humor liable under the doctrine of peculiar risk, the court explained:


[The evidence] was sufficient to permit a jury finding that Good Humor knew or had
special reason to know of the risks to children likely to arise from the street vending of ice
cream . . . .

 . . . .

 . . . The vendors do not possess any special experience or knowledge concerning
the risk peculiar to their task. Good Humor, by contrast, has special and detailed
knowledge of the peculiar risks to children involved in its operation and is in the best
position to ensure reasonable safety awareness. Despite its concededly extensive
knowledge of those risks, moreover, Good Humor has apparently chosen to disclaim
responsibility for warning its vendors or for taking any precautions whatsoever against the
known and specific dangers to children who purchase ice cream from their vendors. 


Id. at 1305-06. (5)

 Kirby argues that peculiar risk is not a separate degree of dangerous activity, but is instead
merely a part of the "inherently dangerous work" exception to the general rule of non-liability for acts of
independent contractors. Texas case law has briefly discussed the doctrine of peculiar risk, but only in
regard to section 416 of the Restatement, not section 413, and it has never been directly applied. (6) See,
e.g., Gessell v. Traweek, 628 S.W.2d 479, 482 (Tex. App.--Texarkana 1982, writ ref'd n.r.e.);
Gaspard v. Cox, 583 S.W.2d 877, 879 (Tex. Civ. App.--El Paso 1979, writ ref'd n.r.e.). The inherent-danger and peculiar-risk exceptions are closely related because both focus on the independent-contractor
relationship and the particular circumstances surrounding a specific job.  Although the doctrines of peculiar
risk and inherently dangerous activities are related, however, "they are not identical and ought not to be
confused." Good Humor, 757 F.2d at 1311 n.7 (Bork, J., concurring).

 Many legal doctrines emphasize the importance of specific circumstances, but it does not
follow that they all embrace the same fundamental principles. The difference between the doctrines of
peculiar risk and inherently dangerous work is that peculiar risk occupies an intermediate position between
the employer's absolute immunity for an independent contractor's negligence in ordinary circumstances
and the employer's absolute liability for inherently dangerous activities. El-Meswari v. Washington Gas
Light Co., 785 F.2d 483, 492 (4th Cir. 1986). Inherently dangerous work has been described as that
which is dangerous no matter how skillfully done. Agricultural Warehouse, Inc. v. Uvalle, 759 S.W.2d
691, 696 (Tex. App.--Dallas 1988), writ denied per curiam, 779 S.W.2d 68 (Tex. 1989). Work is
inherently dangerous if it "must result in probable injury to third persons or the public." Goolsby v.
Kenney, 545 S.W.2d 591, 594 (Tex. Civ. App.--Tyler 1976, writ ref'd n.r.e.) (emphasis added). The
peculiar-risk doctrine, on the other hand, applies to work that can be done safely if the risk peculiar to that
work is known and appropriate precautionary steps are taken.

 Read asks us to adopt the particular version of the peculiar-risk exception embodied in
Section 413. We need not formally adopt section 413, however, because we believe a balancing of the
factors present in this case under traditional Texas notions of duty is sufficient to impose on Kirby a duty
to take reasonable precautionary measures designed to prevent the type of injury suffered by Read.

 In deciding whether to apply the peculiar-risk exception in this case, this Court must
balance several interrelated factors. We must weigh the risk, foreseeability, and likelihood of injury against
the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the
consequences of placing the burden on the defendant. Greater Houston Transp. Co. v. Phillips, 801
S.W.2d 523, 525 (Tex. 1990). Although Texas courts have traditionally considered foreseeability to be
the most significant of these factors, other factors must also be considered, including whether one party had
superior knowledge of the risk or a right to control the actor who caused the harm. See Graff v. Beard,
858 S.W.2d 918, 920 (Tex. 1993). In determining whether a legal duty exists, we also take into account
not only the laws and policies of this state, but the law of other states and the United States and the views
of respected and authoritative restatements and commentators. SmithKline Beecham Corp. v. Doe, 903
S.W.2d 347, 351 (Tex. 1995).

 The dominant factor, and the one we address initially, is foreseeability. Kirby markets its
products exclusively through in-home demonstrations and sales conducted by dealers. It is no great
surprise that some of those applying to be Kirby dealers have histories of crime, violence, or sexually
deviant behavior. Logically, if precautions are not taken to weed out applicants with such past histories,
it is likely that some of them will be hired. Sending a salesperson with a history of criminal offenses or
deviant sexual behavior into the home of an elderly individual or a homemaker alone or with small children,
in an environment where the resident could easily be impeded from calling for help, is calculated to create
a risk that an ill-intentioned salesperson will take advantage of the customer in some way.

 In support of its position that no duty exists, Kirby cites the recent supreme court decision
of Golden Spread Council, Inc. v. Akins, 926 S.W.2d 287 (Tex. 1996). In Akins, the plaintiff sought
recovery for the sexual molestation of her son by the scoutmaster of his Boy Scout troop. The local scout
council, Golden Spread Council ("GSC"), had received a report that an assistant troop leader named Estes
had been "messing with some boys." GSC did not report this to the Boy Scouts of America, Inc. ("BSA"),
which maintained an "unfit list" containing the names of persons it considered unfit for leadership positions. 
As a result, Estes's name never made it onto BSA's unfit list. Thereafter, with only minimal further
investigation, GSC proceeded to recommend Estes as the scoutmaster for another troop. After Estes
molested the plaintiff's son, she sued GSC and BSA. The trial court granted summary judgment for both
defendants, but the court of appeals reversed and remanded for trial. Although it affirmed the court of
appeals' reversal of summary judgment as to GSC, the supreme court reinstated the summary judgment
in favor of BSA, holding that BSA owed no duty to the victim under the particular facts of that case.

 We believe Akins is distinguishable from the present case. First and foremost, the duty
asserted by the plaintiff in Akins was far-reaching in its scope: 


[Plaintiff] alleged that GSC and BSA had a duty to reasonably and properly screen, select,
train, supervise and retain scoutmasters. [Plaintiff] alleges that appellees breached this duty
by, inter alia, failing to screen scoutmasters such as Estes, failing to remove scoutmasters
such as Estes, failing to warn scouts and parents of scouts of numerous prior sexual abuse
incidents known to appellees, and failing to take adequate measures to stop the sexual
abuse of [the plaintiff's son]. The gravamen of [plaintiff's] complaint is that GSC and BSA
were negligent in failing to take steps to remove Estes from his position as a troop leader.



Akins v. Estes, 888 S.W.2d 35, 41 (Tex. App.--Amarillo 1994), rev'd in part and aff'd in part sub
nom. Golden Spread Council v. Akins, 926 S.W.2d 287 (Tex. 1996). Thus, the gist of the plaintiff's
complaint in Akins was that GSC had specific information about Estes, yet failed to use it; the scope of the
asserted duty was that BSA itself should have been required to "screen, train, and supervise" Estes. In
rejecting this asserted duty, the supreme court emphasized not only that BSA itself had no information about
Estes, but also that imposing on BSA the duty of personal screening and supervision urged by the plaintiff
would be "a tremendous burden." 926 S.W.2d at 290.

 Unlike the plaintiff in Akins, Read's cause of action is founded on Kirby's knowledge of
the peculiar risk of sending persons of unknown backgrounds into private homes, a knowledge arising in
part from Kirby's specific awareness of prior assaults by Kirby dealers. Moreover, the duty Read seeks
to impose is not for Kirby itself to screen, train, and supervise its dealers, but for Kirby, having a direct
contractual relationship with its distributors, to take reasonable precautions through its relationship with
those distributors, including Sena. The present case would be more factually analogous to Akins if, for
example, (1) Sena had actually discovered the reports of Carter's deviant behavior, (2) Sena failed to
further investigate the reports and failed to make Kirby aware of the reports, (3) Sena hired Carter anyway,
(4) Carter assaulted Read, and (5) Read sued Kirby asserting that Kirby had a duty independently to
screen and supervise all of its dealers, including Carter. If those were the facts and allegations in the
present case, our analysis could well be controlled by Akins. The differences, however, are obvious and
significant: (1) Kirby was effectively Sena's employer, putting Kirby in a position to direct, or at least warn,
Sena to take precautionary measures, (2) Kirby, not Sena, was aware of previous assaults by Kirby
dealers, and (3) the scope of the duty asserted by Read would require by Kirby efforts that were minimal.

 In the present case, the risk created by sending an individual with felonious tendencies into
the home of a vulnerable person is foreseeable both through common sense and through Kirby's actual
knowledge of prior assaults by dealers selling Kirby vacuums. The record demonstrates that in 1983, for
example, Linda McLean let a Kirby dealer into her apartment to demonstrate a Kirby vacuum cleaner. 
The dealer brought with him a set of knives as a "door opener" or "gift offering" for allowing the in-home
demonstration. After beginning the demonstration, the Kirby dealer used the knives in assaulting and raping
McLean. See McLean v. Kirby Co, 490 N.W.2d 229, 232 (N.D. 1992). When the Kirby dealer who
raped McLean was hired, he had already been convicted of two assault charges and two weapons charges
earlier that year. Additionally, he had a charge of criminal sexual conduct pending against him. Id. As with
Mickey Carter, Kirby did not take any precautions in directing its independent distributor to perform a
background check on the Kirby dealer who assaulted McLean. The North Dakota Supreme Court
affirmed an award of damages in McLean's suit against Kirby, holding that because of Kirby's door-to-door sales requirement, Kirby created a peculiar risk and had a duty to require its distributors to investigate
potential dealers before hiring them. Id. at 234.

 It is worth noting that Gene Windfeldt, who was president of Kirby at the time of the trial
in the present case, was the divisional supervisor of the North Dakota region where the McLean rape took
place at the time of that assault. Thus, his knowledge of that prior incident was not imputed but personal.

 Moreover, the McLean rape was not the first recorded incident of a Kirby dealer assaulting
a customer. The record contains evidence of other assaults on Kirby customers that Kirby must have been
aware of. For example, in 1969 Kirby was sued by a woman who was assaulted and battered by a Kirby
dealer who had a criminal record. See Bennett v. T & F Dist. Co., 285 A.2d 59 (N.J. Super. Ct. App.
Div. 1971). In Bennett the New Jersey appellate court affirmed a denial of summary judgment sought by
the defendants and remanded the cause for trial. Id. at 62. Windfeldt, the president of Kirby since 1988,
testified that in addition to the Bennett and McLean rapes, he was aware of at least one other incident, in
the late 1980's, in which a woman was accosted or assaulted in her home by a Kirby dealer. (7)

 Besides foreseeability, other factors also weigh in favor of imposing on Kirby a duty to take
reasonable precautions. In the present case, Kirby was in an ideal position to ameliorate the peculiar risk
inherent in the in-homes sales it required by motivating its distributors to take adequate safety precautions. 
This could be done through contractual requirements or through warnings placed in Kirby's regular
communications with its distributors. Thus, Kirby is in the best position to ensure that reasonable safety
precautions are taken, because it selects the work to be performed, hires contractors to perform it, and
benefits from the performance of the work. Prosser and Keeton on the Law of Torts § 71, at 509 (5th
ed. 1984); see also Guido Calabresi, Optimal Deterrence and Accidents, 84 Yale L. J. 656 (1975) (in
these cases there is special reason to place initial responsibility on employer if he is "more likely to consider
the risk" and is better able to assess ways to mitigate risk); Guido Calabresi, Some Thoughts on Risk
Distribution and the Law of Torts, 70 Yale L. J. 499, 547 (1961).

 Although the likelihood of injury at the hands of a Kirby dealer was not shown to be great,
that factor is offset by the grave nature of the risk and the severity of the potential injury. Few crimes are
considered more repugnant by our society than sexual assault. Gene Windfeldt, President of Kirby,
testified that there is a serious risk involved in allowing someone with a deviant criminal background to
participate in door-to-door sales. Marshall Herron, Kirby's Vice-President of Sales, testified that a person
with a history like Mickey Carter's should not be retained as a Kirby dealer because he would be a threat
to the people who allowed him to enter their homes.

 The above factors weigh heavily in favor of imposing a duty on Kirby, but we must balance
them against the social utility of Kirby's conduct, the magnitude of the burden on Kirby to take reasonable
care under the circumstances, and the consequences of placing the burden of Kirby. Greater Houston
Transp. Co., 801 S.W.2d at 525. First, although home solicitation may be helpful to the portion of the
population that is home-bound, its general social utility seems to be minimal. (8) A majority of the population
appears to be content to make their purchases according to their own schedules and in a public setting,
usually at a retail store or by catalog. Door-to-door sales appear to be much less prevalent than they once
were, possibly reflecting society's diminishing need and desire for such services. Moreover, there is no
evidence that Kirby's in-home sales approach is designed to benefit home-bound persons. On the
contrary, the sole purpose of the approach appears to be the maximization of Kirby's profits.

 Nor would placing a duty on Kirby to require or warn its distributors to screen potential
dealers be a significant burden on Kirby. Some jurisdictions have imposed a stricter than normal duty on
all companies that hire persons to enter prospective customers' homes or otherwise come into close contact
with the public. (9) The Restatement would require that Kirby provide in its Distributor Agreement that its
distributors take special precautions, or that Kirby exercise reasonable care in some other manner, to
alleviate the peculiar risk of in-home demonstrations and sales. See Restatement (Second) of Torts §
413(a)-(b) (1965). Thus, the mere issuance by Kirby of a warning to its distributors of the peculiar risk
of door-to-door sales and the need to conduct background checks on prospective dealers might, by itself,
satisfy its duty of reasonable care. (10) Either way, the magnitude of this burden on Kirby is small.

 Kirby also argues, however, that the consequences of placing this burden on it would be
burdensome on its distributors, who would actually have to perform the background checks. This
argument appears disingenuous, because Kirby's practice since 1992 has been to instruct some of its
distributors to "Always Be Sure To Have A Thorough Criminal Background Check Performed On
Each Applicant Before Recruiting Anyone."  Although the training manual containing this instruction was
only offered for sale, to distributors who attended certain Kirby conferences in Cleveland, Kirby
presumably would not have gone to the trouble of printing it if it had not wanted the distributors who did
obtain it to abide by its warning. Thus, Kirby itself obviously felt that the benefits of performing background
checks on prospective dealers outweigh any burdens the performance of such checks imposes on its
distributors. (11)

 Further, Texas courts have often imposed an additional duty with regard to investigating
a prospective employee in situations where the employee has special access to a particularly vulnerable
group. See Porter v. Nemir, 900 S.W.2d 376, 386-87 (Tex. App.--Austin 

1995, no writ) (recognizing higher duty in context of drug and alcohol abuse treatment counselors);
Deerings W. Nursing Ctr. v. Scott, 787 S.W.2d 494, 496 (Tex. App.--El Paso 1990, writ denied)
(recognizing higher duty with respect to persons involved in care of elderly); cf. Tex. Educ. Code Ann.
§44.034 (West 1996) (requiring any person who contracts with school district to give notice of prior
convictions). (12)

 We conclude that the balance of factors weighs in favor of imposing on Kirby a duty in this
case. Accordingly, we hold that, under the circumstances of this case, Kirby had a duty to take reasonable
precautions to prevent or deter its distributors from hiring persons with histories of crime, violence, or
sexually deviant behavior as Kirby dealers. Kirby cannot insulate itself from liability in its own field of
business when it requires its distributors to hire salespeople to make in-home demonstrations, knowing of
the risks inherent in home solicitation, yet does not take reasonable steps to minimize those risks. Cf.
Mbank El Paso, N.A. v. Sanchez, 836 S.W.2d 151, 153 (Tex. 1992) (when duty is imposed by law on
basis of concerns for public safety, party bearing duty cannot escape it by delegating it to independent
contractor).


(ii) Duty under Restatement (Second) of Torts § 414

 Independent of the peculiar-risk doctrine, we think Kirby also owed Read a duty of care
under section 414 of the Restatement. The question of control over the work performed by an independent
contractor or his employees arises in connection with questions concerning liability of the employer of the
independent contractor to third persons for the negligence of the independent contractor or its employees. 
The supreme court expressly recognized an exception to the general rule of non-liability of the employer
when it adopted section 414 of the Restatement. See Redinger v. Living, Inc., 689 S.W.2d 415, 418
(Tex. 1985). Section 414 provides: "One who entrusts work to an independent contractor, but who
retains the control of any part of the work, is subject to liability for physical harm to others for whose safety
the employer owes a duty to exercise reasonable care." Restatement § 414 (1965). This rule applies when
the employer retains control over some aspect of the independent contractors work, but does not retain
the degree of control that will subject him to liability as a "master" under traditional master-servant law. 
Redinger, 689 S.W.2d at 418; Restatement § 414, cmt. a (1965); see also Exxon Corp. v. Quinn, 726
S.W.2d 17, 19-20 (Tex. 1987). The employer's specific control must be more than a right to order that
work start or stop or that progress reports be generated. See Redinger, 689 S.W.2d at 418 (citing
Restatement § 414, cmt. c (1965)). The right to control an independent contractor or his employees can
arise either by contract or by course of dealing. Pollard v. Missouri Pac. R.R., 759 S.W.2d 670, 671
(Tex. 1988).

 Kirby argues that section 414 and Redinger are limited to premises liability cases and are
not applicable to the facts of this case. We disagree. In Redinger, the supreme court adopted section 414
in its entirety and did not limit its future application solely to premises liability cases. (13) Thus, the Redinger
rule of liability logically applies to any set of facts that satisfies the requirements of section 414. See Tirres
v. El Paso Sand Prods., Inc., 808 S.W.2d 672, 676 (Tex. App.--El Paso 1991, writ denied); Parker
v. Enserch Corp., 776 S.W.2d 638, 643 (Tex. App.--Dallas 1989), aff'd in part and rev'd in part,
794 S.W.2d 2 (Tex. 1990) (affirming that portion of appellate court's judgment dealing with control of
independent contractor). In applying this rule, if the employer is found to have retained sufficient control,
it can be held liable "unless [it] exercises [its] supervisory control with reasonable care so as to prevent the
work which [it] has ordered to be done from causing injury to others." Restatement § 414, cmt. a
(1965) (emphasis added).

 Kirby retained strict control over exactly how and where its products were to be sold. To
maximize its profits, Kirby required its distributors and dealers to enter into people's homes and engage
in extensive personal contact in an isolated setting. Nonetheless, Kirby contends its contractual
requirements with its distributors are not evidence of control, but merely contract terms that are "conditions
of employment." We disagree.

 In support of its contention, Kirby cites Farrell v. Greater Houston Transp. Co., 908
S.W.2d 1 (Tex. App.--Houston [1st Dist.] 1995, writ denied), and Ross v. Texas One Partnership, 796
S.W.2d 206 (Tex. App.--Dallas 1990), writ denied per curiam, 806 S.W.2d 222 (Tex. 1991). In
Farrell, the plaintiffs sued the Yellow Cab Company after one of its independently contracted drivers
struck the plaintiffs' car, injuring them. In affirming a summary judgment against the plaintiffs, the court said
that the driver's work was completely independent in that he controlled "how, when, where, and if he
worked." Farrell, 908 S.W.2d at 3 (emphasis added). Additionally, the court held that although the title
to the cab was in Yellow Cab's name, this was merely for insurance purposes and a prerequisite to signing
the independent contractor agreement. Id. at 4. Similarly, in Ross, the plaintiff, who was shot by a security
guard, sued the owner of the apartments where the security guard worked. Ross, 796 S.W.2d at 210. 
The Dallas Court of Appeals affirmed a summary judgment against the plaintiff, holding that although the
contract between the parties specified certain tasks to be undertaken by the security company, the owner
of the apartments did not have the right to control the "methods" of accomplishing those tasks assigned to
the security company. Id.

 Unlike both Ross and Farrell, Kirby's requirement that its distributors and dealers sell
exclusively through in-home demonstrations is a contractual mandate evincing Kirby's exercise of control
over the medium and locality for selling its products. In both Ross and Farrell, we think liability would
have attached if, as here, the employer had retained contractual control over the manner and location in
which the task was to be accomplished.

 Kirby also cites Tirres v. El Paso Sand Prod., Inc., 808 S.W.2d 672 (Tex. App.--El
Paso 1991, writ denied), for the proposition that contractual requirements are merely contract terms and
not evidence of control. Tirres stands for the proposition that section 414 does not purport to impose
general vicarious liability on the employer for the independent contractor's entire performance; the
exception to the general rule still applies when the employer retains control over the specific aspect of the
contractor's work alleged to have caused the injury. Id. at 676. Stated another way,


[S]ection 414 imposes a duty on the employer, who has retained the right to control the
independent contractor in some aspect of his work, to exercise reasonable care in the
exercise of that control so as to avoid proximately causing injuries or damages to others
while in the performance of the particular aspect [being controlled].



Id. (emphasis added); cf. Exxon Corp. v. Tidwell, 867 S.W.2d 19, 23 (Tex. 1993) (in cases alleging
negligent security, court's inquiry must focus on who had specific control over safety and security of
premises, rather than more general right of control over operations).

 Here, Kirby retained the right to control precisely where and how its products were to be
sold--through personal in-home demonstrations. After retaining this control in the present case, Kirby
failed to take any precautions regarding Sena's activity in recruiting dealers to perform such demonstrations. 
Because Kirby retained the right to control where and by what method its distributors and dealers sold
Kirby products, and because it was this aspect of the marketing process that gave rise to the risk of harm
to customers, we conclude that Kirby had a duty of care toward Read under section 414 of the
Restatement. See Tovar v. Amarillo Oil Co., 692 S.W.2d 469, 470 (Tex. 1985); see also Exxon Corp.
v. Quinn, 726 S.W.2d 17, 20 (Tex. 1987).

 Summarizing the duty issue, we hold that Kirby was under a duty to take reasonable
precautions to prevent the assault on Read because of the peculiar risk inherent in permitting in-home sales
to be conducted by persons with histories of crime, violence, or sexually deviant behavior. Additionally,
Kirby was under a duty to take appropriate care because, by requiring that its products be sold only
through in-home demonstrations, Kirby exercised sufficient control to owe a duty of reasonable care to
Read in connection with the selection of persons to perform those demonstrations. We need not address
precisely what steps would be necessary to satisfy the duty Kirby owed to Read. (14) We overrule points
of error one and two.


Proximate Cause


 In its third point of error, Kirby argues that evidence is legally insufficient to show
that Kirby's negligence proximately caused Read's damages. In deciding a no-evidence point, this Court
must consider only the evidence and inferences tending to support the finding of the trier of fact and
disregard all evidence and inferences to the contrary. Burroughs Wellcome Co. v. Crye, 907 S.W.2d
497, 499 (Tex. 1995). We will uphold the finding if more than a scintilla of evidence supports it. Id. The
evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding
given the facts proved in the particular case. Id.

 The components of proximate cause are "cause in fact" and foreseeability. Doe v. Boys
Club of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995); Travis v. City of Mesquite, 830
S.W.2d 94, 98 (Tex. 1992). The test for cause in fact is whether the negligent "act or omission was a
substantial factor in bringing about the injury" without which the harm would not have occurred. Doe, 907
S.W.2d at 477 (quoting Prudential Ins. Co. v. Jefferson Assocs., Ltd., 896 S.W.2d 156, 161 (Tex.
1995)). Cause in fact is not shown if the defendant's negligence did no more than furnish a condition that
made the injury possible. Doe, 907 S.W.2d at 477; Union Pump Co. v. Albritton, 898 S.W.2d 773,
776 (Tex. 1995). The question of proximate cause is one of fact that is particularly within the province of
the jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances. 
Farley v. M M Cattle Co., 529 S.W.2d 751, 756 (Tex.1975); Yap v. ANR Freight Sys., Inc., 789
S.W.2d 424, 425-26 (Tex. App.--Houston [1st Dist.] 1990, no writ).

 In the present case, Kirby's lack of an instruction or warning advising Sena to conduct a
background investigation or at least call Carter's past employers and references was a substantial factor
in bringing about Read's injury. It did not simply cause Read to be in the wrong place at the wrong time. 
See Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 472 (Tex. 1991) ("There may be cases in which . . .
a defendant's negligence exposes another to an increased risk of harm by placing him in a particular place
at a given time."). Although Sena admitted that he did not call Carter's 

references or past employers or do any other type of background check, he testified that he would have
done so if directed to by Kirby. It is undisputed that if Sena had merely called Carter's prior employers
or references, he would have learned about Carter's deviant history and would not have hired him as a
Kirby dealer.

 Kirby contends the recent supreme court case of Doe v. Boys Club of Greater Dallas,
Inc., 907 S.W.2d 472 (Tex. 1995), precludes a finding of proximate cause against Kirby. We disagree. 
In Doe, the plaintiffs sought damages based on sexual molestation of minor boys by a man named Mullens,
who had worked as a volunteer at the Boys Club. Id. at 476. The molestations occurred on trips not
sponsored by the Boys Club. The plaintiffs contended the Boys Club was negligent in that a background
check of Mullens would have revealed a conviction for driving while intoxicated. Id. In holding that the
Boys Club's conduct was not a cause in fact of the sexual assault, the Doe court made two observations. 
Id. at 477-78. First, it was not established that, even if the Boys Club had known of Mullens's conviction,
it would have prohibited him from being a volunteer. Second, because the sexual assaults occurred at non-sponsored activities, "Mullens' presence at the club was but a preliminary condition in the course of events
which made possible his assaults . . . ." Id. at 478.

 The present case is easily distinguished from Doe. First, as discussed above, if Sena had
been directed by Kirby to investigate Carter's employment or criminal history, he would have done so,
would have learned about Carter's deviant history, and would not have hired him as a Kirby dealer. 
Moreover, while the molestations in Doe took place on "private camping trips" not connected to the Boys
Club, Carter was in Read's home specifically to give a Kirby demonstration and try to make a sale of a
Kirby vacuum. Indeed, it was only through Carter's cloak of legitimacy as a Kirby dealer that he gained
access to Read's home at all. We conclude there is more than a scintilla of evidence to show that Kirby's
failure to warn or instruct its distributor Sena to conduct a background check of Carter was a cause in fact
of Read's injury.

 The other element of proximate cause is foreseeability, which requires that a person of
ordinary intelligence should have anticipated the danger created by the negligent act or omission. Doe, 907
S.W.2d at 478; Travis, 830 S.W.2d at 98; Nixon v. Mr. Property Management Co., 690 S.W.2d 546,
549-50 (Tex. 1985). The particular accident need not be foreseen, but the injury must be of such a general
character as might reasonably have been anticipated. Nixon 690 S.W.2d at 551; Carey v. Pure Distrib.
Corp., 124 S.W.2d 847, 849 (Tex. 1939). 

 Kirby contends the injury to Read was not foreseeable because in the eighty-year history
of Kirby, there have apparently been only three reported assaults on Kirby customers by dealers during
in-home demonstrations before Carter's assault on Read. Foreseeability, though, does not require that
parties anticipate the precise manner in which injury will occur once they have created a dangerous situation
through their negligence. Travis, 830 S.W.2d at 98. As discussed above, many of Kirby's officers,
including both its president and vice-president of sales, acknowledged that allowing someone with a
background like Carter's to be sent behind closed doors selling Kirby vacuum cleaners creates a risk so
severe that anything reasonable should be done to prevent it. This testimony, combined with evidence that
Kirby was aware of at least three prior assaults on women by Kirby dealers during in-home
demonstrations, constitutes more than a scintilla of evidence that Read's injury was foreseeable. We
overrule point of error three.


 In its fourth point of error, Kirby asserts that the evidence is factually insufficient to support
the jury's finding that Kirby's negligence proximately caused Read's injuries. When reviewing a fact finding
to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should
set aside the judgment only if the evidence is so weak as to make the finding clearly wrong and unjust. 
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); In Re King's Estate, 660, 661 (Tex. 1951). Having
examined all the evidence, and in light of our discussion above, we conclude the evidence supporting the
jury's finding that Kirby's negligence proximately caused Read's injuries is not so weak as to make the
finding clearly wrong and unjust. See Ellis County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex.
1994). We overrule point of error four.


Punitive Damages


 In its fifth point of error, Kirby argues that the evidence is legally insufficient to support the
finding that Kirby acted with gross negligence. We agree. The test for gross negligence contains both an
objective and a subjective component. See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 21-22
(Tex. 1994); Wal-Mart Stores, Inc. v. Alexander, 868 S.W.2d 322, 325-26 (Tex. 1993). Objectively,
the defendant's conduct must create "an extreme degree of risk." Moriel, 879 S.W.2d at 22. 
Subjectively, the defendant "must have actual subjective awareness of the risk involved, but nevertheless
proceed in conscious indifference to the rights, safety or welfare of others." Id. at 23. (15)

 The objective component of gross negligence is "a function of both the magnitude and the
probability of the potential injury, [and] is not satisfied if the defendant's conduct creates a remote
possibility of serious injury; rather, the defendant's conduct must create the 'likelihood of serious injury'
to the plaintiff." Universal Servs. Co., Inc. v. Ung, 904 S.W.2d 638, 641 (Tex. 1995) (citing Moriel,
879 S.W.2d at 22) (emphasis added). In Ung, a member of a road crew was killed when he was struck
by a trailer that became detached from its truck when the truck hit a pothole. 904 S.W.2d at 639. Eight
months prior to Ung's death, his supervisor had witnessed another trailer come loose after hitting the same
pothole. Although no one was injured on that earlier occasion, the supervisor was clearly aware of the
pothole and knew that his crew was working near it the day of Ung's death. Id. In a suit against Universal
brought by Ung's survivors, a jury found Universal grossly negligent. The supreme court reversed the
finding of gross negligence against Universal, holding that "even though the adjacent pothole had previously
caused at least one other trailer to decouple, this evidence is as a matter of law not sufficient" to create
the likelihood of serious injury. Id. at 642 (emphasis added).

 As to this issue, we are unable to find a meaningful distinction between the present case and
Ung. Based on that controlling precedent, the evidence in the present case, even viewed in the light most
favorable to the jury's verdict, does not show that an assault by a Kirby dealer on a customer was "likely." 
At the time of trial in this case, there were over 700 Kirby distributors and 12,000 Kirby dealers around
the world. To maintain this sales force, Kirby distributors recruit roughly 50,000 people each year for
dealer positions. These distributors and dealers provide approximately 1.5 million in-home demonstrations
annually. Even with this number of  demonstrations, there is evidence of only four reported incidents of
sexual assault by a dealer or distributor against a customer in Kirby's eighty-year history. While the
seriousness of the injury is indisputably extreme, and even though it was reasonably foreseeable that such
an assault could occur, nonetheless the record contains no evidence that it was likely to occur. See Ung,
904 S.W.2d at 642. The evidence is legally insufficient, therefore, to support the finding of gross negligence
against Kirby. (16) We sustain point of error five.

 Having sustained Kirby's fifth point of error, we need not address its remaining points,
which challenge the finding of gross negligence and the award of exemplary damages.


Read's Cross Point


 In a single cross-point, Read argues that the trial court erred by not accepting the jury's
first determination of actual damages. During the jury deliberations for the second phase of the trial, the
jurors sent out a note saying that they had reached an impasse in determining exemplary damages: some
jurors felt that exemplary damages were included in the actual-damage finding made after the conclusion
of the trial's first phase. (17) The court gave the jury a standard Allen charge (18) and the jury continued
deliberations. In order to cure the jury's confusion, the trial judge suggested telling the jurors that in light
of their uncertainty, they should carefully review the charge to see if they followed the instructions in
answering the actual-damages questions; if the jurors were not satisfied with how they followed the
instructions, they should deliberate further on both exemplary damages and actual damages simultaneously. 
Counsel for Read did not object to the procedure suggested by the trial court, but expressed concern about
the substance of the instruction to be given to the jury. Only counsel for Kirby objected, stating his
opposition to giving any further instructions.

 After additional discussion among the parties, the trial judge explained the specific
instruction he proposed to give the jury and asked the parties' trial counsel if that was satisfactory. Read's
counsel responded, "If we're going to give an instruction, I'm satisfied with that instruction Your
Honor." (Emphasis added.) Counsel for Kirby again was the only party to lodge an objection. The court
overruled Kirby's objection and gave the instruction to the jury orally in open court. (19)

 After further deliberations, the jury returned a new damages verdict, finding $200,000 in
actual damages and $1,500,000 in exemplary damages. It was at this time that Read first objected, asking
the court to allow a brief period of reargument. The court denied this request, accepted the jury's verdict,
and released the jurors from their oath.

 Without regard to whether the trial judge erred in giving the jury the supplemental
instruction, Read waived any right to complain by failing to object timely to the trial court's action. 
Objections to supplemental jury instructions must be made in conformity with the rules regarding the charge. 
Garza v. Southland Corp., 836 S.W.2d 214, 219-20 (Tex. App.--Houston [14th Dist.] 1992, no writ);
see also Tex. R. Civ. P. 272, 286. Rule 272 provides that in every instance, on penalty of waiver, a party
shall present to the court objections to the court's charge before the court reads the charge to the jury. See
Tex. R. Civ. P. 272; Missouri Pac. R.R. v. Cross, 501 S.W.2d 868, 872-73 (Tex. 1973). Thus, in order
to preserve for appellate review a complaint about a supplemental charge, a party must make any
objections or requests to such a charge before it is read to the jury. Cf. George Pharis Chevrolet, Inc.
v. Polk, 661 S.W.2d 314, 317-18 (Tex. App.--Houston [1st Dist.] 1983, no writ) (failure to object to
court's further communications and instructions to jury constituted waiver). By failing to object to the
supplemental instruction in the present case until after it was read to the jury and after the jury deliberated
and returned a verdict, Read waived any complaint. Indeed, before the instruction was read, Read's
counsel affirmatively told the trial court they were "satisfied" with the instruction. Although Kirby objected
to the supplemental instruction before it was read to the jury, Read may not use another party's objection
to preserve error where the record does not reflect a timely expression of her intent to adopt the objection. 
See Martinez v. State, 833 S.W.2d 188, 191 (Tex. App.--Dallas 1992, pet. ref'd).

 Although rule 286 of the Rules of Civil Procedure does allow for additional argument
following a supplemental instruction, permitting such argument is expressly committed to the trial court's
discretion. See Tex. R. Civ. P. 286. We cannot say that the trial court in the present case abused its
discretion in denying Read's request. We overrule Read's cross-point. 


CONCLUSION


 Having concluded that the evidence is legally insufficient to support the finding of gross
negligence, we reverse the portion of the trial court's judgment awarding exemplary damages and render
judgment denying such damages. We affirm the remainder of the trial court's judgment.



 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Aboussie and Jones

Affirmed in Part; Reversed and Rendered in Part

Filed: May 1, 1997

Publish

1. In order to satisfy their contractual obligations to Kirby, distributors' agreements with their dealers also
specify how sales are to be conducted. The third and fourth paragraphs of the "Kirby Independent Dealer
Agreement" state:

3. Dealer fully understands that in order to protect and maintain The Kirby Company's trade
name, reputation, and competitiveness in the marketplace, Kirby Systems must be sold
exclusively to consumer end-users by in-home demonstration.


4. Dealer certifies and agrees that any Kirby system consigned to dealer will only be sold to
consumer end-users after a personal demonstration which will be conducted in the home of
the personal end-user. Dealer understands that any other type of resale of Kirby Systems to
wholesalers, retailers, or to anyone who is purchasing the product for the purpose of resale
as opposed to consumer end-use, will constitute a breach of this Agreement and that Dealer's
right to sell Kirby Systems will be terminated immediately.
2. The Reads also sued William Boruta, another Kirby distributor who lived closer to where Carter
worked and to whom Carter's dealer contract had been assigned by Sena. Boruta died during trial,
however, and the Reads' claims against him were severed.
3. See Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 46 (Tex. Civ.
Prac. & Rem. Code Ann. § 41.007, since amended and renumbered as Tex. Civ. Prac. & Rem. Code
Ann. § 41.008 (West Supp. 1997)).
4. [4] See, e.g., Redinger v. Living, Inc., 689 S.W.2d 415 (Tex. 1985) (employer of independent
contractor is liable if it retains a right of control over contractor's work and fails to use reasonable care in
exercising that control); Loyd v. Herrington, 182 S.W.2d 1003 (Tex. 1944) (employer of independent
contractor has non-delegable duty to ensure that inherently dangerous work is performed safely); Jones
v. Southwest Newspapers Corp., 694 S.W.2d 455 (Tex. App.--Amarillo 1985, no writ) (employer has
duty to use ordinary care in employing an independent contractor). See generally Comment,
Responsibility for the Torts of an Independent Contractor, 39 Yale L. J. 861 (1930) (discussing the
range of exceptions to the general rule of non-liability).
5. [5] See also Leudtke v. Arizona Family Restaurants, Inc., 774 P.2d 804 (Ariz. 1989). In Leudtke
a mother brought suit for the wrongful death of her six-year-old son who was killed after patronizing an ice
cream truck owned and operated by an independent contractor. The trial court granted the employer's
motion for directed verdict on the issue of the employer's independent liability under the peculiar-risk
doctrine. On appeal, the plaintiff relied on Good Humor. The intermediate court affirmed, distinguishing
Good Humor on its facts. See Leudtke v. Arizona Family Restaurants, Inc., 763 P.2d 262, 264-65
(Ariz. Ct. App. 1988). The Arizona Supreme Court granted the plaintiff's petition for review, but the
parties settled all issues before the court had ruled on the merits. Consequently, the court dismissed the
appeal. In doing so, however, the court exercised its discretion and vacated the part of the court of
appeals' opinion dealing with the potential liability of employers of independent contractors. See Leudtke,
774 P.2d at 804.
6. [6] Under section 413, an employer can, by taking reasonable precautions, escape liability for an
independent contractor's work that involves a peculiar risk, whereas under section 416 the employer
cannot escape liability and is absolutely liable for the independent contractor's negligence. See Restatement
§ 416 (1965). Section 416 is similar to the inherently-dangerous-work exception. See Restatement § 427
cmt. a (1965). Additionally, unlike section 413, section 416 is not predicated on the personal negligence
of the employer; rather, it is a rule of vicarious liability, making the employer liable for the negligence of the
independent contractor irrespective of whether the employer himself was at fault. Restatement Ch. 15,
Topic 2, Introductory Note.
7. Additionally, Kirby demonstrated its awareness of the peculiar risk of harm and of its ability to control
the potential risk by its reaction to an incident in Oregon. After the rape of Linda McLean, Kirby received
an "anonymous tip" that a distributor in Oregon had been indicted for child molestation. After verifying the
tip, Kirby immediately terminated the distributor and notified other distributors in the Northwestern United
States not to hire this particular person. Despite this directive, another distributor, Wayne Oiler, did hire
the former distributor to be a dealer. Kirby promptly terminated its distributor agreement with Mr. Oiler
and, in so doing, fired the indicted dealer, thus eliminating the potential risk that the dealer posed to Kirby
customers.
8. We assume that the relevant conduct is Kirby's insistence that its products be marketed via in-home
sales. If the relevant conduct is considered to be Kirby's failure to warn or instruct its distributors to
conduct background checks, such conduct has no social utility whatsoever.
9. [9] See, e.g., Connes v. Molala Transport System, Inc., 831 P.2d 1316, 1321-22 (Colo. 1992) (in
cases involving close contact with public or close contact with particular persons, employer's duty of
reasonable care is not satisfied by mere review of personal data disclosed by applicant on job application
form or during personal interview); Tallahassee Furniture v. Harrison, 583 So.2d 744, 751 (Fla. Dist.
Ct. App. 1991) ("If an employer wishes to give an employee the indicia of authority to enter into the living
quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to
do so.").
10. [10] It has been argued that section 413 of the Restatement should not formally adopted because it can
be read to obligate employers to enter into particular contracts with their independent contractors: "In
practice, the Restatement formulation may undermine the advantages of doing business through independent
contractors, advantages which accrue to the public as well as the employer and which the general rule of
non-liability is intended to preserve. Imposition of a duty to warn has no such untoward effects." Good
Humor, 757 F.2d at 1312 (Bork, J., concurring). Because our holding is based on traditional Texas duty
principles rather than section 413 of the Restatement, and because even a duty to warn is sufficient to affirm
Kirby's liability under the facts of this case, we need not enter that debate.
11. Sena apparently had not received the manual and was unaware of the warning in it.
12. [12] Texas courts have also imposed liability for failing to search beyond an employee's application in
situations involving drivers of large vehicles and armed security guards. See Wasson v. Stracener, 786
S.W.2d 414, 422 (Tex. App.--Texarkana 1990, writ denied) (fact issue regarding failure to check
independent contractor's driving record); North Houston Pole Line Corp. v. McAllister, 667 S.W.2d
829, 834 (Tex. App.--Houston [14th Dist.] 1983, no writ) (employer did not check driving history before
hiring to drive large truck); Estate of Arrington v. Fields, 578 S.W.2d 173, 178 (Tex. Civ. App.--Tyler
1979, writ ref'd n.r.e.) (security company had "duty to make inquiry as to the competence and
qualifications of those he considers for employment, especially where engaged in an occupation which could
be hazardous to life and limb and requires skilled or experienced servants," particularly where application
revealed prior arrests).
13. [13] Although the majority of Texas cases imposing liability on employers of independent contractors for
negligently retained control have involved an employer who was an owner or occupier of the premises
where the injury occurred, these cases do not limit the application of Redinger or section 414 to those
particular fact patterns. See, e.g., Exxon Corp. v. Quinn, 726 S.W.2d 17 (Tex. 1987); Davis v. R.
Sanders & Assoc. Builders, 891 S.W.2d 779 (Tex. App.--Texarkana 1995, no writ); Staublien v. Dow
Chemical Co., 885 S.W.2d 502 (Tex. App.--El Paso 1994, no writ); Welch v. McDougal, 876 S.W.2d
218 (Tex. App.--Amarillo 1994, writ denied); Pena v. TXO Prod. Corp., 828 S.W.2d 188 (Tex.
App.--Corpus Christi 1992, no writ); Ross v. Texas One Partnership, 796 S.W.2d 206 (Tex.
App.--Dallas 1990), writ denied per curiam, 806 S.W.2d 222 (Tex. 1991); Edco Prod. Inc. v.
Hernandez, 794 S.W.2d 69 (Tex. App.San Antonio 1990, writ denied); Parker v. Enserch Corp., 776
S.W.2d 638 (Tex. App.--Dallas 1989), aff'd in part and rev'd in part, 794 S.W.2d 2 (Tex. 1990).
14. Although Kirby's first two points of error state that the evidence is both legally and factually
insufficient to show that it breached any duty to Read, Kirby's entire argument under these points of error
focuses on whether Kirby owed Read a duty at all, not on the sufficiency of evidence in support of a breach
of duty. See William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and "Insufficient
Evidence," 69 Tex. L. Rev. 515, 522-23 (1991) ("The 'no duty' variation of the 'no evidence' point is
qualitatively different from a no evidence point where the law is clear but the facts are not"). If Kirby
intended its points of error to assert that the evidence was insufficient to support the finding of a breach of
duty, it waived that complaint by failing to argue it. See Tex. R. App. P. 74(f); Green v. Reyes, 836
S.W.2d 203, 213 (Tex. App.--Houston [14th Dist.] 1992, no writ).
15. [15] A slightly different definition of gross negligence is now provided by statute. See Tex. Civ. Prac. &
Rem. Code Ann. § 41.001(5) (West Supp. 1997). The present suit, filed before the effective date of
section 41.001(5), is not subject to the statutory definition. See Act of April 20, 1995, 74th Leg., R.S.,
ch. 19, § 2, 1995 Tex. Gen. Laws 108, 113. 
16. We note that in McLean, the Supreme Court of North Dakota also concluded as a matter of law that
the plaintiff was not entitled to recover exemplary damages from Kirby. See 490 N.W.2d at 246-47.
17. [17] The note the jury sent out stated, "We have reached an impass [sic]. Some feel exemplary damages
were included in the 1.5 million. We also feel -0- exemplary damages would tell Kirby we condone their
business practices."
18. [18] See Allen v. United States, 164 U.S. 492 (1896). 
19. [19] Specifically, the trial court instructed the jury:


I want you to retire to the jury room to carefully review the charge and the instructions
concerning Questions 5 and 7 [the actual and exemplary damages questions] to see if you have
followed the instructions in answering the questions in the charge. If you are satisfied that you
have followed the instructions concerning Questions 5 and 7, then you may return into court
with your verdict on both charges. If you are not so satisfied, then you may deliberate further
in light of the instructions on Questions 5 and 7, and then the presiding juror may make any
changes beside the original answer and initial those changes.